# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| OPTIMISCORP, a Delaware Corporation, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | C.A. No. 2020-0183-MTZ |
| WILLIAM ATKINS, GREGORY SMITH, and JOHN WAITE, | ) ) ) ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION

Date Submitted: February 8, 2023
Date Decided: June 1, 2023

Theodore A. Kittila, William E. Green, Jr., HALLORAN FARKAS + KITTILA LLP, Wilmington, Delaware, *Attorneys for Plaintiff.*

Stephen B. Brauerman, Sarah T. Andrade, Megan A. McGovern, BAYARD, PA, Wilmington, Delaware, *Attorneys for Defendants.*

**ZURN, Vice Chancellor.**

The directors of a company that owns physical therapy clinics split into factions; those factions have been warring before this Court, and others, for a decade. On one front, three former directors who remain stockholders have been pursuing derivative claims in this Court against the other directors. They pursued derivative claims against the company's former outside counsel in arbitration.

The three stockholders prevailed in arbitration: the arbitrator awarded monetary relief for the derivative claims and fees for the stockholders' counsel. The stockholders tried to keep this award from the company. They struck a deal with their arbitration opponent: give our counsel the award instead of the company, and we will keep the arbitration confidential and wait to confirm the arbitration award. The stockholders held onto the award for nearly eight months, first arguing that the award was not actually derivative, and then claiming the award should be distributed to a subset of stockholders they deemed "innocent," namely themselves, their friends, and their family.

In pursuit of the award, the company filed this action against the stockholders. The company sought a declaratory judgment that it is the rightful owner of the arbitration award, and injunctive relief requiring the stockholders to return it. The company also claimed the stockholders breached their fiduciary duties as derivative plaintiffs and unjustly enriched themselves. The three stockholder defendants filed counterclaims seeking declaratory judgments that they could keep the award and

1

distribute it to the company's "innocent stockholders," and that the defendants' counsel could extract additional fees from the award. The Court resolved all declaratory judgment claims in the company's favor on earlier motions.

This opinion addresses the stockholders' motion for summary judgment on the company's breach of fiduciary duty and unjust enrichment claims. The stockholders' motion is denied as to the breach of fiduciary duty claim: and on the undisputed facts before the Court, summary judgment is granted in the company's favor. The three stockholders as derivative plaintiffs took possession of a derivative claim, under an exception to the rule that directors control company assets. The stockholders argue that to the extent they owe fiduciary duties to the company, their conduct is measured by the gross negligence standard and their decision to retain the award is protected by the business judgment rule. They also contend the company cannot meet its burden to show they were unjustly enriched. This opinion concludes that derivative plaintiffs owe stringent fiduciary duties because they serve as company agents—not as directors entitled to the breathing room offered by the gross negligence standard and the business judgment rule.

In a typical derivative action, derivative plaintiffs' agency authority ends when the derivative claim is monetized. The board has managerial authority over that award—not the derivative plaintiffs. Stockholders may request pro rata distribution from a tribunal, but they lack authority to possess or manage a monetized

2

award themselves.

Here, the three stockholders negotiated possession of the derivative arbitration award. As agents of the company, they were duty-bound to return that award to the board's managerial authority. Instead, they withheld it from the board and purported to manage it, intending to distribute it to stockholders they deemed "innocent." The stockholders breached their duty of care by divesting the company of its authority to manage the award and by failing to perform their obligations as company agents. By withholding the award with designs of distributing it to themselves, their friends, and their family, the stockholders breached their duty of loyalty.

The stockholders' motion is granted as to the unjust enrichment claim. Even under a standard friendly to the non-movant, the company failed to establish the stockholders were unjustly enriched. Because the award was in the stockholders' counsel's trust account, the stockholders were not directly enriched by the award. And the company has not met its burden to show they were indirectly enriched by withholding the award.

As far as I can predict, the only battle on this front that remains to be fought is over the damages the company suffered as a result of the stockholders' breaches of fiduciary duty. There is a genuine dispute as to the amount of damages that requires further development at trial.

## I.  BACKGROUND[1]

Plaintiff Optimis*Corp* ("Optimis," "Plaintiff," or the "Company") is a "holding company that develops software and acquires, manages, and operates physical therapy clinics around the country, purchasing such business for stock and without paying cash."[2]  Defendants William Atkins, Gregory Smith, and John Waite (collectively, "Defendants") are current Optimis stockholders, former Optimis directors, and former board members and executives of Optimis's main operating unit, Rancho Physical Therapy, Inc. ("Rancho").  They are also current principals of Optimis's direct competitor, All-Star Physical Therapy ("All-Star").  In the

---

[1] For purposes of the pending motion, I draw the following facts from the Verified Amended Complaint, available at Docket Item ("D.I.") 73 [hereinafter "Am. Compl."] for "uncontested background facts," and the record the parties submitted including depositions, answers to interrogatories and admissions on file, together with any affidavits, and public filings. *Deane v. Maginn*, 2022 WL 624415, at *1 (Del. Ch. Mar. 2, 2022); Ct. Ch. R. 56(c); *In re Rural Metro Corp. S'holders Litig.*, 2013 WL 6634009, at *7 (Del. Ch. Dec. 17, 2013) ("Applying [Delaware] Rule [of Evidence] 201, Delaware courts have taken judicial notice of publicly available documents that 'are required by law to be filed, and are actually filed, with federal or state officials.'" (quoting *In re Tyson Foods, Inc. Consol. S'holder Litig.*, 919 A.2d 563, 584 (Del. Ch. 2007))).  Citations in the form of "Atkins Dep. —" refer to the transcript of William Andrew Atkins's deposition, available at D.I. 163.  Citations in the form of "Smith Dep. —" the transcript of Gregory Smith's deposition, available at D.I. 163.  Citations in the form of "Waite Dep. —" the transcript of John Waite's deposition, available at D.I. 163.  Citations in the form of "Atkins Aff. —" refer to the Affidavit of William Atkins in Support of Defendants' Opening Brief in Support of Their Motion for Judgment, available at D.I. 182.  Citations in the form of "Smith Aff. —" refer to the Affidavit of Gregory Smith in Support of Defendants' Opening Brief in Support of Their Motion for Judgment, available at D.I. 181.  Citations in the form of "Waite Aff. —" refer to the Affidavit of John Smith in Support of Defendants' Opening Brief in Support of Their Motion for Judgment, available at D.I. 180.

[2] D.I. 187 [hereinafter "AB"] at Ex. 3 [hereinafter "Arb. Award"] at 5.

derivative action underlying this dispute, Defendants serve as derivative plaintiffs prosecuting claims on the Company's behalf.

### A. Defendants Prevail On Employment And Derivative Claims.

The parties have a long history of litigation.[3] Two proceedings have been resolved in Defendants' favor: Defendants' conduct in victory is at the heart of this case. In 2013, Defendants brought an employment action against Rancho (the "Employment Action").[4] On August 30, 2018, the court entered judgment in their favor.[5] The judgment was affirmed on November 17, 2020.[6]

On October 7, 2015, Defendants assumed the mantle of derivative plaintiffs and sued Optimis's board at the time and its former outside counsel, Allen Z. Sussman (the "Derivative Action").[7] In February and March 2016, the Derivative Action defendants moved to dismiss under Court of Chancery Rules 12(b)(1), 12(b)(6), 13(a), and 23.1.[8] On June 16, 2016, the Court granted a stipulated order to voluntarily dismiss Sussman for lack of subject matter jurisdiction under an

---

[3] Am. Compl. ¶¶ 13, 16, 18, 22; D.I. 94 [hereinafter "Ans."] ¶¶ 13, 16, 18, 22.

[4] AB at Ex. 29; D.I. 179 [hereinafter "OB"] at Ex. 10; Atkins Aff. ¶ 11; Smith Aff. ¶ 10; Waite Aff. ¶ 10.

[5] Atkins Aff. ¶ 12; Smith Aff. ¶ 11; Waite Aff. ¶ 11.

[6] OB Ex. 1.

[7] *Atkins, et al. v. Morelli, et al.*, C.A. No. 11581-VCZ, at D.I. 1 (Del. Ch. Oct. 7, 2015) [hereinafter "Deriv. Action"]; Arb. Award at 2.

[8] Deriv. Action at D.I. 18, D.I. 19, D.I. 22, D.I. 23, D.I. 26.

arbitration provision.[9]  The Court never ruled on whether the Derivative Action plaintiffs had derivative standing to bring the claims against Sussman.

On August 30, 2016, the Derivative Action plaintiffs—Defendants here—filed an arbitration with JAMS derivatively on behalf of Optimis against Sussman (the "Arbitration").[10]  Optimis was not a party to the Arbitration.[11]  The Arbitration demand asserted claims for legal malpractice and breach of fiduciary duty.[12]  The arbitrator issued an "Interim Award" on April 29, 2019, and a "Final Award" on August 12.[13]  On September 12, the arbitrator issued the "Amended Final Award" finding Sussman liable.[14]  Defendants, as derivative claimants, secured $5,278,222.95 in compensatory damages, plus fees, costs, and pre-and post-judgment interest on behalf of Optimis (the "Award").[15]

---

[9] Deriv. Action at D.I. 36.

[10] OB Ex. 2; Am. Compl. ¶ 22; Ans. ¶ 22.

[11] Arb. Award at 5.

[12] *Id.* at 3; OB Ex. 2 ¶¶ 198–208.

[13] Arb. Award at 69; OB Ex. 9 at ASW_2020-0183_00002753.

[14] Arb. Award.

[15] *Id.* at 84–86 (ordering the respondent to pay $5,278,222.95 in compensatory damages plus pre-judgment interest (7% per annum) and post-judgment interest (10% per annum) plus attorneys' fees ($1,435,107.90) plus costs ($436,550.35)).

On September 19, Optimis's board met and discussed the lack of progress in its counsel's "efforts to confirm [the Company] will be sent [the Award] proceeds" and "the limited options available for cash until the Arbitration funds are obtained."[16]

In the meantime, the Derivative Action claims against the Optimis board proceeded. From 2016 through 2019, the Court denied those defendants' motion to dismiss under Rules 12(b)(6), 13(a), and 23.1,[17] and the parties engaged in discovery, related motion practice, and other squabbles.[18]

### B. Defendants Seek To Recover On The Employment Action And To Retain The Award.

On May 24 and 25, 2019, between the arbitration's Interim and Amended Final Awards, Atkins and Smith assigned their rights to the Employment Action judgment to a collections company.[19] On September 26, after the arbitrator issued the Amended Final Award, the collections company filed Atkins's and Smith's assignment of rights in the Employment Action.[20] On or about November 22, the collections company filed a levy against Rancho.[21] On March 12, 2020, the

---

[16] AB Ex. 10 at OPTIMIS_065154.

[17] *See* Deriv. Action at D.I. 58.

[18] Deriv. Action at D.I. 135, D.I. 142, D.I. 143, D.I. 144, D.I. 161 (comprising a motion to disqualify the plaintiffs that was denied, and a motion for summary judgment that was never fully briefed).

[19] AB Ex. 7; Atkins Dep. 111; Atkins Aff. ¶ 14; AB Ex. 8; Smith Dep. 63; Smith Aff. ¶ 13.

[20] AB Ex. 29 at 15, 24; Atkins Dep. 111; Smith Dep. 64.

[21] AB Ex. 5 at ASW_2020-0183_00000206; AB Ex. 21.

California Superior Court lifted the levy on the grounds that it was improper.[22]

Optimis alleges the levy weakened its operating company Rancho, which in turn strengthened its competitor All-Star, priming All-Star to sell its assets to Confluent Health in December 2021.[23]

Meanwhile, on September 19, 2019, one week after the arbitrator issued the Amended Final Award, Defendants' counsel and Sussman's counsel agreed amongst themselves—to the exclusion of Optimis—that in exchange for keeping the arbitration confidential, Sussman would pay the award to the IOLTA account of Defendants' counsel Bayard, P.A. ("Bayard").[24]

Meanwhile, Optimis's counsel at the time was asking for confirmation that the Award would be paid to Optimis.[25] At some point between September 27 and

---

[22] Am. Compl. ¶ 47; Ans. ¶ 47.

[23] AB at 30–31, 47, 53–55, 59; AB Ex. 26; AB Ex. 27 at OPTIMIS_065160; AB Ex. 28 at OPTIMIS_065168–69; Atkins Dep. 19–21; Smith Dep. 30–31; Waite Dep. 21; D.I. 198 [hereinafter "Hr'g Tr."] at 63–64.

[24] AB Ex. 11 at ASW_2020-0183_00000414.

[25] *See, e.g.*, AB Ex. 10 at OPTIMIS_065154 (September 19, 2019 Optimis board meeting minutes: "Although we have been expending proceeds from the Sussman arbitration, our Delaware counsel has made no progress in his efforts to confirm that we will be sent these proceeds."); AB Ex. 14 at OPTIMIS_065178 (October 15, 2019 Optimis finance committee meeting minutes: "Mr. Price also provided the Committee with a confidential update regarding the efforts of our counsel to ensure that the arbitration award is received promptly."); AB Ex. 15 at ASW_2020-0183_00003665 ("Please be advised that I am not authorized to sign any iteration of the 'Confidentiality Agreement' that does not provide for the arbitration proceeds being wired directly into my firm's trust account."); *id.* at ASW_2020-0183_00003664 (Optimis's then-counsel's October 29, 2019 email urging Defendants' counsel not to intercept the Arbitration Award); AB Ex. 17 at

8

October 25, the Arbitration parties included Optimis in negotiating a confidentiality agreement.[26]  On October 25, Sussman's counsel emailed Optimis's then-counsel and Defendants' counsel attaching a draft confidentiality agreement by which the Interim and Final Awards would be confidential, the Award would be paid to Bayard by October 31, and Defendants would delay seeking to confirm the Award.[27]

---

OPTIMIS_037879–84; D.I. 163 [hereinafter "Morelli Dep."] 141 ("[W]e were freaking out come, you know, September and October when you [Brauerman] were not responding to Mr. Harris [Optimis's then-counsel].  And sort of -- we were in -- a little incredulous that the award may not be properly turned over to the company."); *id.* at 142 ("[Q:]  And from the period of 4/29/19 through 9/12/19, it's your testimony that Optimis attempted through Mr. Harris to obtain agreement to have the award paid to Optimis and that Mr. Price spoke with KBK.  Did I understand that correctly? . . .  THE WITNESS:  Yeah.  I think those are the primary efforts that I – that stick out to me, yeah."); *id.* at 143 ("Q[:]  Okay.  Other than Mr. Harris'[s] efforts and Mr. Price's efforts, are you aware of any other efforts between January – I'm sorry – between April 29th of '19 and September 12th of '19 that Optimis took to ensure the award would be paid to Optimis?  A[:]  Yes.  For example, I described other effort by me, by O'Shea, by others that, you know, there were many, many people involved in trying to get to the bottom of it.").  Plaintiff asserts its then-counsel called Bayard on October 11.  Am. Compl. ¶ 27.  Plaintiff's then-counsel appeared at oral argument.  Hr'g Tr. 2–3.  Defendants disputed any October 11 correspondence about the Award in their answer and at argument.  Ans. ¶ 27; Hr'g Tr. 73.

[26] AB Ex. 13 at ASW_2020-0183_00000064 ("As we have discussed, it is critical that the confidentiality of the award be preserved.  As you suggested in your Sept 19 email to me, we will draft a confidentiality agreement for your and Steve's review.  I understand that you will provide me with more specific information for payment (all that was indicated in your Sept 19 email was payment to Bayard, P.A.'s escrow account).").  On October 17, Smith emailed Atkins, Waite, and their arbitration counsel:  "Payment does not indicate it will go directly to Steve and his account.  I worry that the way it's stated with Morelli being included on the agreement, the door may be open for him to re-direct the money.  We need a way to place leverage on Sussman/[Sussman's counsel] to ensure the money goes directly to Steve and prevents Morelli from taking it right afterword [sic].  Not sure if we can insert verbiage to do so without tipping them off.  I didn't think Morelli would have been included as he wasn't a direct party on this part of the derivative suit against Sussman."  *Id.* at ASW_2020-0183_00000063.

[27] AB Ex. 15 at ASW_2020-0183_00003667.

On October 28, Optimis's then-counsel responded: "Please be advised that I am not authorized to sign any iteration of the 'Confidentiality Agreement' that does not provide for the arbitration proceeds being wired directly into my firm's trust account."[28] Defendants' counsel replied:

> That is not acceptable to my clients. And since your client isn't a party to the arbitration, I'm not sure how you have the right to mandate that. The final award requires the award to be paid to Claimants and Mr. Sussman already agreed to make that payment to my firm's escrow account in order to secure the 60-day extension we already provided. If payment is not made on or before October 31, we will move forward with our efforts to confirm the Award in Court and will seek relief against Mr. Sussman for his breach of the parties' agreement.[29]

Optimis's counsel replied, in relevant part:

> [Y]ou note (below) that Optimis is not a party to the arbitration, but I think it's more accurate to say that Optimis is necessarily a "nominal party" to the Claimants' derivative claims (regardless of how the arbitration demand is styled). And as you know, because it's hornbook law, the derivative claims and the resulting derivative recovery at issue here are assets that belong exclusively to Optimis. Of course[,] it's equally well established that as shareholder representatives of the Company, your clients pursued the derivative claims against M[r]. Sussman[] on Optimis'[s] behalf. Nothing in the Final Award justifies dishonoring these bedrock Delaware principles.

---

[28] *Id.* at ASW_2020-0183_00003665.

[29] *Id.*

Indeed, to the contrary, the Final Award makes clear that the awarded damages stem purely from derivative claims and are meant to redress harm "incurred by Optimis." The Final Award says nothing about *pro rata* recovery or anything else that could even arguably justify Claimants withholding the Award from Optimis. Yet, it appears that—contrary to their fiduciary duties as shareholder representatives and settled Delaware law—Claimants intend to withhold from Optimis the entire Award absent a court order requiring they turn-over the Award proceeds to Optimis as the rightful owner of that corporate asset.

. . . [A]ny delays in funding the Final Award will not be due to Optimis, but rather, your clients' apparent designs to wrongfully retain a corporate asset that belongs solely to the entity they claimed to represent in the arbitration.[30]

Defendants' counsel responded by disputing Optimis's counsel's interpretation of Delaware law.[31]

On October 31, the Award was transferred to Bayard's IOLTA account.[32] On November 12, Optimis's then-counsel followed up with Bayard.[33] The next morning, Optimis's counsel repeated his ask for "written assurances that Bayard will not distribute any portion of the Award, directly or indirectly, to Messrs. Waite, Atkins, and/or Smith, or any other party or person, absent a court order authorizing any such distribution."[34] He went on to ask Bayard: "Are you refusing to offer such

---

[30] *Id.* at ASW_2020-0183_00003664.

[31] AB Ex. 17 at OPTIMIS_037880 ("Your email badly misstates Delaware law, the arbitration, and the underlying facts.").

[32] RB Ex. 22 at BAYARD000348.

[33] AB Ex. 17 at OPTIMIS_037878.

[34] *Id.* at OPTIMIS_037877 (internal quotation marks omitted).

assurance?  Or worse, have you released any of the Award proceeds either to your firm or your clients.  Please advise."[35]

That evening, Bayard sent Optimis's counsel a "Notice of Distribution" proposing that Defendants distribute the Award "on a *pro rata* basis, to those individuals and entities holding stock in Optimis*Corp* between September 21, 2012 and June 24, 2013, other than the Individual Defendants [in the Derivative Action] and any entities owned or controlled in whole or in part by any of them."[36] Optimis's then-counsel responded by letter dated November 21 objecting to Defendants' proposed distribution.[37]

That same day, the finance committee of Optimis's board met and determined the Award, "which has not been turned over to the Company, and may not be received for the foreseeable future, . . . has created a working capital crisis."[38] Optimis management repeated these concerns at other board and committee meetings, and ultimately approved interim loans as one solution.[39] Two days later,

---

[35] *Id.*

[36] *Id.* at OPTIMIS_037886.

[37] AB Ex. 20.

[38] AB Ex. 18 at OPTIMIS_065179.

[39] *E.g.*, AB Ex. 10 at OPTIMIS_065154 ("Although we have been expecting proceeds from the Sussman arbitration, our Delaware counsel has made no progress in his efforts to confirm that we will be sent these proceeds. . . . Therefore, the management team has been looking for interim options to obtain working capital and working with the Finance Committee to determine the best approach."); AB Ex. 14 at OPTIMIS_065178 ("Mr. Price

12

Optimis's then-counsel contacted Bayard about the levy on Rancho's accounts and the Award, reiterating, "As I have stressed several times now, there is no basis under Delaware law for you and your clients to withhold the Award proceeds which represent purely derivative recovery belonging solely to OptimisCorp."[40] Bayard did not respond.[41]

On January 2, 2020, Optimis's current counsel sent a demand letter to Bayard "demand[ing] that Bayard release the balance of the [$8,675,794.00 Award] due to Optimis without further delay."[42] Then Optimis turned to this Court for help.

---

opened the [October 15, 2019 finance committee] meeting with a discussion regarding the need to consider approval of a loan of $500,000 in order to bridge the Company until the receipt of the arbitration award. Mr. Price also provided the Committee with a confidential update regarding the efforts of our counsel to ensure that the arbitration award is received promptly."); AB Ex. 27 at OPTIMIS_065161–62 ("As Mr. Price had previously informed the Board, there was an arbitration award issued in April in the Sussman derivative action that was revised [in September]. Mr. Price explained that the amount of $6.7MM had been awarded to the Company. Steve Brauerman, one of the lawyers for Waite, Atkins and Smith, seems to be trying to delay the process for the Company to recover the arbitration award. . . . The Company worked very hard to obtain interim loans during the last few months and is on track to close a deal with a New York based company named Fulcrum."); AB Ex. 28 at OPTIMIS_065169 ("Peter Rogers explained to the Board that the management team has worked tirelessly to raise capital the past few months in order to protect the Company from catastrophic harm caused by the failure of the former Rancho owners to turn over the award stemming from the Sussman arbitration.").

[40] AB Ex. 21 at ASW_2020-0183_00000238.

[41] *Id.* at ASW_2020-0183_00000237.

[42] AB Ex. 22 at OPTIMIS_043803.

### C. Optimis Pursues The Award.

On January 6, counsel for Optimis entered its appearance in the Derivative Action and filed a Motion for Entry of an Order to Show Cause, seeking an order directing Bayard to "show cause why the Court should not enter an Order requiring Bayard to release" the Award to Optimis.[43]  On January 17, the Court asked for a joint status update.[44]  Bayard responded that as a nonparty in the Derivative Action, it was not properly served with Optimis's motion; that the motion was not properly filed in the Derivative Action; and that the derivative plaintiffs would respond by the end of February.[45]  The Court requested a stipulated briefing schedule on the motion; on February 14, Optimis filed a Motion For Entry of an Expedited Briefing Schedule and Hearing on its Motion for Entry of an Order to Show Cause, relating difficulty in negotiating a stipulated briefing schedule.[46]  Defendants opposed expedition.[47]

On March 2, nearly two months after Optimis's initial motion, the Derivative Action plaintiffs filed an opposition disputing this Court's authority to grant that

---

[43] Deriv. Action at D.I. 187; *see also* Deriv. Action at D.I. 186, D.I. 188.

[44] Deriv. Action at D.I. 191.

[45] Deriv. Action at D.I. 192.

[46] Deriv. Action at D.I. 195.

[47] Deriv. Action at D.I. 200.

14

motion.[48]  On March 9, the Court heard argument and denied the motion on the grounds that it was not the correct procedural tool to obtain the relief sought.[49]

Plaintiff filed its initial complaint in this action on March 10, 2020, seeking declaratory and injunctive relief to force Defendants to turn the Award over to the Company.[50]  Count I requested a declaratory judgment that the Award is derivative and should be turned over to the Company, seeking to settle Defendants' argument that the Award was not derivative.[51]  Counts II and III brought claims for breach of fiduciary duty and unjust enrichment.[52]  Defendants opposed expedition and insisted the Award was not derivative.  I bifurcated the proceedings and directed the parties to address Count I first.[53]

On April 2, Defendants answered the complaint and filed counterclaims.[54] Counterclaim Count I sought a declaratory judgment authorizing pro rata distribution of the Arbitration Award.[55]  Counterclaim Count II sought declaratory judgment awarding attorneys' fees to Defendants' counsel over and above those

---

[48] Deriv. Action at D.I. 209.

[49] Deriv. Action at D.I. 213, D.I. 216.

[50] D.I. 1.

[51] *Id.* ¶¶ 43–47.

[52] *Id.* ¶¶ 48–55.

[53] D.I. 18; D.I. 29.

[54] D.I. 21 (comprising Defendants' answer and counterclaims).

[55] D.I. 21 at Counterclaims [hereinafter "Countercl."] ¶¶ 45–49.

awarded by the arbitrator.[56]  The parties then cross-moved for partial judgment on the pleadings on their declaratory judgment counts.[57]  On June 18, I granted Optimis's motion, denied Defendants' cross-motion, and reserved judgment on Defendants' fee request.[58]

On June 25, the parties filed a joint status report explaining that Defendants had not yet remitted the Award to Plaintiff.[59]  Defendants asserted that Plaintiff's request for return of the Award was tantamount to a "request for mandatory injunction."[60]  Defendants claimed that before they could be forced to return the Award to the Company, Plaintiff needed to move for mandatory injunctive relief, the parties had to brief that motion, and the Court had to hold an evidentiary

---

[56] *Id.* ¶¶ 50–57; *OptimisCorp*, 2021 WL 2961482, at *3 ("Specifically, Defendants reasoned that because the[ir] Engagement Letter's thirty-percent contingency would entitle Bayard to $2,602,738.20 and because Bayard already had received $1,435,107.90 in attorneys' fees, Bayard should receive at least an additional $1,167,630.30 in attorneys' fees, subject to an upward adjustment if the Court determines Bayard is entitled to a success fee (the 'Additional Fees').").

[57] D.I. 23; D.I. 32; D.I. 34; D.I. 40; *OptimisCorp*, 2021 WL 2961482, at *4 ("Optimis sought a declaration that the Award is derivative, and that the Award minus the arbitrator's attorneys' fee award should be turned over to Optimis.  Defendants sought a declaration that the Award be distributed on a *pro rata* basis to themselves and Optimis stockholders other than Sussman, his confederates including Morelli, and any entities they own or control in whole or in part.").

[58] D.I. 45; D.I. 46; D.I. 69; *OptimisCorp*, 2021 WL 2961482, at *4 ("On June 18, via a bench ruling after argument, I rejected Defendants' position and determined that the Award is derivative, is based on a purely derivative claim, and must be paid directly to Optimis—not distributed *pro rata* to Defendants' identified subset of individual shareholders.").

[59] D.I. 47.

[60] *Id.* at 4.

16

hearing.[61]  In response, the Court reminded Defendants that its June 18 ruling "determined that the arbitration award at issue is derivative, is based on a purely derivative claim, and must be paid directly to Optimis, rather than a subset of individual shareholders."[62]  The Court suggested that declaratory judgment should be adequate to compel return of the Award, as Defendants would surely comply without a redundant injunction.[63]  On June 26, Defendants wired $5,211,789.70 of the Award to Optimis's counsel's escrow account.[64]

On June 29, Defendants moved to dismiss Counts II and III.[65]  On September 11, Optimis filed a verified amended complaint (the "Amended Complaint") under Court of Chancery Rule 15(aaa).[66] The Amended Complaint also asserts three counts:  Count I, declaratory judgment and injunctive relief; Count II, breach of fiduciary duty; and Count III, unjust enrichment.[67]  Later that month, Defendants again moved to dismiss Counts II and III.[68]

---

[61] *See id.* at 4–5.

[62] D.I. 48 at 3.

[63] *Id.*

[64] D.I. 49.

[65] D.I. 50.

[66] Am. Compl.

[67] *Id.* ¶¶ 51–67.

[68] D.I. 76.  Defendants waited over a month to file their opening brief in support of their motion to dismiss.  D.I. 79.

On July 15, 2021, I denied Defendants' motion to dismiss and Defendants' Counterclaim Count II request for additional fees over and above what the arbitrator awarded (the "Motion to Dismiss Opinion").[69] I concluded Plaintiff had stated a claim that Defendants breached their fiduciary duties to Optimis.[70] On October 14, I entered Plaintiff's proposed order enforcing the Motion to Dismiss Opinion.[71] On November 4, Defendants answered the Amended Complaint.[72]

The fight over the Award then spilled back into the Derivative Action. On July 19, Optimis moved to disqualify Defendants as derivative plaintiffs and to stay the Derivative Action pending this action.[73] The parties quarreled over the scope of the parties' arguments in support of that motion and discovery through the fall.[74] The Court stayed resolution of the motion to disqualify, and therefore the Derivative Action as a whole, pending resolution of this action.[75]

Meanwhile, the parties conducted discovery in this action, and on October 17, 2022, Defendants moved for summary judgment on Counts II and III of the

---

[69] *OptimisCorp*, 2021 WL 2961482. This Court's July 15, 2021 memorandum opinion denying Defendants' motion to dismiss is also found at D.I. 90.

[70] *Id.* at *7–9.

[71] D.I. 93.

[72] Ans.

[73] Deriv. Action at D.I. 224.

[74] Deriv. Action at D.I. 236, D.I. 237, D.I. 244, D.I. 249, D.I. 253, D.I. 255, D.I. 256, D.I. 259, D.I. 260, D.I. 261, D.I. 264.

[75] Deriv. Action at D.I. 266; D.I. 267.

Amended Complaint (the "Motion").[76] The parties fully briefed the Motion and the Court heard oral argument on February 8, 2023.[77] Trial in this matter is scheduled for July 5.[78]

## II. ANALYSIS

The summary judgment standard is familiar. Summary judgment may only be granted when there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law.[79] When the movant carries that burden, the burden shifts to the nonmoving party "to present some specific, admissible evidence that there is a genuine issue of fact for a trial."[80] On any application for summary judgment, "the court must view the evidence in the light most favorable to the non-moving party."[81] "The Court will decline to enter summary judgment when the record indicates a material fact is in dispute or if it seems desirable to inquire more thoroughly into the facts in order to clarify the

---

[76] D.I. 178.

[77] OB; AB; RB; D.I. 197; Hr'g Tr.

[78] D.I. 200.

[79] *Twin Bridges Ltd. P'ship v. Draper*, 2007 WL 2744609, at *8 (Del. Ch. Sept. 14, 2007) (citing Ct. Ch. R. 56(c)).

[80] *Deloitte LLP v. Flanagan*, 2009 WL 5200657, at *3 (Del. Ch. Dec. 29, 2009).

[81] *Merrill v. Crothall-Am., Inc.*, 606 A.2d 96, 99 (Del. 1992) (citing *Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 157 (1970)).

application of law to the circumstances."[82] "The court has inherent authority to grant summary judgment *sua sponte* against the moving party, but should only do so when the state of the record is such that the non-moving party is clearly entitled to such relief."[83]

### A. Defendants' Motion Is Denied As To Count II; Summary Judgment Is Granted In Plaintiff's Favor On Liability.

Count II alleges Defendants breached their fiduciary duty of care by

> (a) failing to promptly release the derivative proceeds to Optimis; (b) failing to seek judicial guidance regarding the payment of the derivative proceeds; (c) failing to hold the derivative proceeds in an interest-bearing account during the pendency of the dispute with Optimis; (d) seeking to extract personal benefits for themselves to the exclusion of other stockholders of Optimis; [and] (e) inflicting economic injuries on Optimis . . . . not less than $1,500,000 plus pre- and post-judgment interest.[84]

"A claim for breach of fiduciary duty requires proof of two elements: (1) that a fiduciary duty existed and (2) that the defendant breached that duty."[85]

---

[82] *In re Tesla Motors, Inc. S'holder Litig.*, 2020 WL 553902, at *3 (Del. Ch. Feb. 4, 2020) (internal quotation marks and citations omitted).

[83] *Comet Sys., Inc. S'holders' Agent v. MIVA, Inc.*, 980 A.2d 1024, 1034 (Del. Ch. 2008) (citing *Stroud v. Grace,* 606 A.2d 75, 81 (Del. 1992), and *Bank of Del. v. Claymont Fire Co. No. 1,* 528 A.2d 1196, 1199 (Del. 1987)).

[84] Am. Compl. ¶¶ 58–59.

[85] *Beard Rsch., Inc. v. Kates*, 8 A.3d 573, 601 (Del. Ch. 2010) (citing *ZRii, LLC v. Wellness Acq. Gp., Inc.*, 2009 WL 2998169, at *11 (Del. Ch. Sept. 21, 2009)), *aff'd sub nom. ASDI, Inc. v. Beard Rsch., Inc.*, 11 A.3d 749 (Del. 2010).

### 1. Defendants Owed Fiduciary Duties To Plaintiff As Agents.

A derivative claim is a company asset.[86]  Directors owe fiduciary duties to stockholders because they control company assets that stockholders own, including causes of action.[87]  In specific circumstances, it is in the stockholders' best interest for another stockholder to control a cause of action rather than the directors.  A stockholder is permitted to temporarily manage derivative claims if (i) the board permits them to do so, or (ii) a court permits them to do so because they can demonstrate either that the board wrongfully refused the stockholder's demand that the directors pursue the claim, or  "demand is excused because the directors are

---

[86] *In re Countrywide Corp. S'holders Litig.*, 2009 WL 846019, at *9 (Del. Ch. Mar. 31, 2009) ("If derivative claims are to be viewed as assets of a company—and they are—then their treatment must be logically consistent with how other assets are treated."); *United Food & Com. Workers Union v. Zuckerberg*, 250 A.3d 862, 876 (Del. Ch. 2020) ("Section 141(a) vests statutory authority in the board of directors to determine what action the corporation will take with its litigation assets, just as with other corporate assets." (citing *Zapata Corp. v. Maldonado*, 430 A.2d 779, 782 (Del. 1981))), *aff'd sub nom. United Food & Com. Workers Union & Participating Food Indus. Emps. Tri-State Pension Fund v. Zuckerberg*, 2021 WL 4344361 (Del. Sept. 23, 2021).

[87] *N. Am. Cath. Educ. Programming Found., Inc. v. Gheewalla*, 930 A.2d 92, 99 (Del. 2007) (citing *Guth v. Loft*, 5 A.2d 503, 510 (Del. 1939), and *Malone v. Brincat*, 722 A.2d 5, 10 (Del. 1998)); *see Blasius Indus., Inc. v. Atlas Corp.*, 564 A.2d 651, 663 (Del. Ch. 1988) ("The theory of our corporation law confers power upon directors as the agents of the shareholders; it does not create Platonic masters."); *ACE Ltd. v. Cap. Re Corp.*, 747 A.2d 95, 109 n.52 (Del. Ch. 1999) ("In this regard, one additional reason why the law might also give precedence to stockholders' interests over those of acquirors is that the acquiror has the (at least theoretical) opportunity—through a tender offer or election contest—to deal directly with the 'principals'—i.e., the stockholders—rather than the 'agents'—i.e., the board.").

incapable of making an impartial decision regarding the litigation."[88] Otherwise, directors manage the company's assets under 8 *Del. C.* § 141.

Derivative stockholder plaintiffs control derivative claims for purposes of enforcing the company's rights, and so serve as agents of the company. In other words, derivative stockholder plaintiffs are fiduciaries.[89] When derivative

---

[88] *Zuckerberg*, 250 A.3d at 876 ("In a derivative suit, a stockholder seeks to displace the board's authority over a litigation asset and assert the corporation's claim. Unless the board of directors permits the stockholder to proceed, a stockholder only can pursue a cause of action belonging to the corporation if (i) the stockholder demanded that the directors pursue the corporate claim and they wrongfully refused to do so or (ii) demand is excused because the directors are incapable of making an impartial decision regarding the litigation." (citations omitted)); Ct. Ch. R. 23.1.

[89] *OptimisCorp*, 2021 WL 2961482, at *6 (collecting cases); *Boilermakers Loc. 154 Ret. Fund v. Chevron Corp.*, 73 A.3d 934, 961 (Del. Ch. 2013) ("Any stockholder seeking to bring a derivative suit on behalf of the corporation has to act in the best interest of the corporation . . . ."); *see also, e.g.*, *In re Straight Path Commc'ns Inc. Consol. S'holder Litig.*, 2022 WL 728844, at *5 (Del. Ch. Mar. 11, 2022) ("When filing as a representative plaintiff for a class of stockholders, that party seeks out the role of fiduciary for the class." (citing *Steinhardt v. Howard-Anderson*, 2012 WL 29340, at *8 (Del. Ch. Jan. 6, 2012), and then *OptimisCorp*, 2021 WL 2961482, at *5–7)); *Crothall v. Zimmerman*, 94 A.3d 733, 735 (Del. 2014) (noting that a derivative plaintiff "undertake[s]" a "fiduciary status"); *In re Fuqua Indus., Inc. S'holder Litig.*, 752 A.2d 126, 129 (Del. Ch. 1999) ("[A] derivative plaintiff serves in a fiduciary capacity as representative of persons whose interests are in plaintiff's hands and the redress of whose injuries is dependent upon her diligence, wisdom and integrity." (citing *Katz v. Plant Indus., Inc.*, 1981 WL 15148 (Del. Ch. Oct. 27, 1981))); *Steinhardt*, 2012 WL 29340, at *8 ("When a stockholder of a Delaware corporation files suit as a representative plaintiff for a class of similarly situated stockholders, the plaintiff voluntarily assumes the role of fiduciary for the class." (citing *Emerald P'rs v. Berlin*, 564 A.2d 670, 673 (Del. Ch.1989), and *Youngman v. Tahmoush*, 457 A.2d 376, 379 (Del. Ch. 1983))); *In re S. Peru Copper Corp. S'holder Deriv. Litig.*, 52 A.3d 761, 767 n.5 (Del. Ch. 2011) (stating that the "derivative plaintiff 'must be qualified to serve in a fiduciary capacity as a representative of the class of stockholders, whose interest is dependent upon the representative's adequate and fair prosecution of the action'" (quoting *Emerald P'rs*, 564 A.2d at 673)), *aff'd sub nom. Ams. Mining Corp. v. Theriault*, 51 A.3d 1213 (Del.

stockholder plaintiffs control a derivative claim belonging to the stockholders, they

assume fiduciary duties to the company and its stockholders.[90]    Derivative

---

2012); *South v. Baker*, 62 A.3d 1, 21 (Del. Ch. 2012) (observing that a derivative plaintiff serves in a fiduciary capacity, and to maintain a derivative action she must show that she can meet her ongoing fiduciary obligations consistent with the Due Process Clause and "the protection it affords the non-parties on whose behalf the representative plaintiff purports to litigate" (collecting cases)); *Griffith v. Stein ex rel. Goldman Sachs Gp., Inc.*, 283 A.3d 1124, 1139 n.89 (Del. 2022) (same).

[90] *In re Ebix, Inc. S'holder Litig.*, 2014 WL 3696655, at *19 (Del. Ch. July 24, 2014) ("Through their derivative claims, the Plaintiffs seek to stand in the shoes of Ebix, without director approval, and assert claims of the corporation . . . ."); *see also Lambrecht v. O'Neal*, 3 A.3d 277, 289 (Del. 2010) ("In a double derivative action the plaintiffs stand in the shoes of BofA; that is, they are enforcing BofA's *post-merger* right . . . ."); Ct. Ch. R. 23.1(a) ("In a derivative action brought by one or more shareholders or members to *enforce a right of a corporation* or of an unincorporated association, the corporation or association having failed to enforce a right which may properly be asserted by it . . . ." (emphasis added)); *Katz*, 1981 WL 15148 (finding the language in Federal Rule of Civil Procedure 23.1—"The derivative action may not be maintained if it appears that the plaintiff does not fairly and adequately represent the interests of the shareholders or members similarly situated in enforcing the right of the corporation or association."—"merely made explicit what was already implicitly a part" of Court of Chancery Rule. 23.1); *In re Wal-Mart Stores, Inc. Del. Deriv. Litig.*, 2016 WL 2908344, at *13 n.71 (Del. Ch. May 13, 2016) ("Determining the effect to be given a judgment in an action under Rule 23.1 generally does not pose any unusual problems because the shareholder-plaintiff in a stockholder-derivative action is seeking to enforce the right of the corporation and the corporation is present as a defendant." (internal quotation marks omitted) (quoting 7C Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1840 (3d ed. 1998) [hereinafter "Wright & Miller"])); Wright & Miller § 1840 ("Unlike a class action, the shareholder-plaintiff is not seeking to enforce an individual right belonging to each of the shareholders; the shareholder is suing on behalf of the corporation.  Thus, only the interests of the other stockholders as they are indirectly affected by the adjudication of the corporate right are at stake."); *cf. Gelof v. Prickett, Jones & Elliott, P.A.*, 2010 WL 759663, at *2 (Del. Ch. Feb. 19, 2010) ("In other words, without a party having discretion and control over the disposition of another party's assets, fiduciary duties are not implicated because the classic principal-agent problem simply does not arise."); *see Atkins v. Morelli*, C.A. 11581-VCMR, D.I. 58 at 5–6 (Del. Ch. Apr. 7, 2017) (TRANSCRIPT) ("'A derivative plaintiff serves in a fiduciary capacity as representative of persons whose interests are in plaintiff's hands and the redress of whose injuries is dependent upon her

stockholder plaintiffs enforcing the company's rights owe the company and their fellow stockholders the duties of care and loyalty.[91]

In the Arbitration, Defendants served as representative plaintiffs pursuing derivative claims.[92] As I have already explained in this action, "Defendants owed fiduciary duties to the Company and its stockholders with respect to the corporate asset entrusted to them: the derivative claim they prosecuted in the Arbitration, which ultimately resulted in the derivative Award belonging to Optimis."[93]

Defendants' Motion for summary judgment presents two questions: (i) what standard governed Defendants' conduct; and (ii) what standard governs this Court's review of their conduct. "When determining whether corporate fiduciaries have

---

diligence, wisdom and integrity.' And that's from [] *Bakerman v. Sidney Frank Importing Co.* [2006 WL 3927242, at *10 (Del. Ch. Oct. 10, 2006)]. 'In order to challenge a plaintiff's adequacy, a defendant has the burden to show a substantial likelihood that the derivative action is not being maintained for the benefit of the shareholders.'"); *South*, 62 A.3d at 22 ("[I]n a derivative action, 'the defendant must show a substantial likelihood that the derivative action is not being maintained for the benefit of the shareholders.'" (quoting *Emerald P'rs*, 564 A.2d at 674, and citing *Bakerman*, 2006 WL 3927242, at *10, and *Can. Com. Workers Indus. Pension Plan v. Alden*, 2006 WL 456786, at *8 (Del. Ch. Feb. 22, 2006))).

[91] *See* Restatement (Third) of Agency § 8.08 (2006) ("[A]n agent has a duty to the principal to act with the care, competence, and diligence normally exercised by agents in similar circumstances."); Restatement (Third) of Agency § 8.01 (2006) ("An agent has a fiduciary duty to act loyally for the principal's benefit in all matters connected with the agency relationship.").

[92] D.I. 69 at 58; *e.g.*, Arb. Award at 32 ("Admittedly, Claimants stand in the Company's shoes in bringing the shareholder derivative claims on its behalf.").

[93] *OptimisCorp*, 2021 WL 2961482, at *7.

breached their duties, Delaware corporate law distinguishes between the standard of conduct and the standard of review."[94] "The standard of conduct describes what [fiduciaries] are expected to do and is defined by the content of the duties of loyalty and care. The standard of review is the test that a court applies when evaluating whether [fiduciaries] have met the standard of conduct."[95]

Defendants seek summary judgment under the gross negligence standard of conduct and business judgment standard of review. But those standards are reserved for directors; derivative stockholder plaintiffs as agents are held to a simple negligence standard, and do not enjoy the protections of the business judgment rule. Plaintiff need not establish gross negligence, or rebut the business judgment rule, to succeed on its breach of care claim.[96]

### i. Standard Of Review

Defendants argue they enjoy the protections of the business judgment rule:[97]

---

[94] *Chen v. Howard-Anderson*, 87 A.3d 648, 666 (Del. Ch. 2014) (collecting cases).

[95] *In re Trados Inc. S'holder Litig.*, 73 A.3d 17, 35–36 (Del. Ch. 2013).

[96] *Metro Storage Int'l LLC v. Harron*, 275 A.3d 810, 844 (Del. Ch. 2022) ("[I]n the corporate context, gross negligence has its own special meaning that is akin to recklessness." (collecting cases)).

[97] OB at 29–34, 36, 39; *id.* at 31 ("Defendants' efforts to preserve the [Arbitration] Award for the benefit of Optimis'[s] innocent stockholders is protected by the business judgment rule and cannot sustain a duty of care claim."); *id.* at 32 ("Even if the Court finds that it would have been more prudent to place the funds in an interest-bearing account, Defendants' decision is still protected by the business judgment rule as it is not 'grossly negligent.'" (citations omitted)); *id.* at 39 ("The record contains no facts that would rebut the business judgment rule presumption."); D.I. 194 [hereinafter "RB"] at 14–17; *id.* at 14

25

they claim they exercised their "business judgment" in "good faith" to "determine[] that releasing the derivative proceeds to Optimis would not be in the best interests of the Company's innocent stockholders."[98]  Optimis contends the business judgment rule is inapplicable to Defendants as derivative stockholder plaintiffs.[99]  I agree with Optimis.

The business judgment rule does not protect just anyone's "business" decisions.  It protects a board's business decisions made with its uniquely paramount authority over the company's affairs.[100]  "The 'business judgment' rule is a judicial creation that presumes propriety, under certain circumstances, *in a board's decision*."[101]  "The business judgment rule can only be understood as intended to

---

("The business judgment rule has been expanded beyond corporate directors. . . . Plaintiff provides no explanation for why the business judgment rule would not similarly apply to a derivative plaintiff, who is executing a task normally handled by directors:  pursuing litigation.").

[98] OB at 29.

[99] AB at 41, 47–52.

[100] *Zapata*, 430 A.2d at 782 ("Viewed defensively, [the business judgment rule] does not create authority.  In this sense the 'business judgment' rule is not relevant in corporate decision making until after a decision is made.  It is generally used as a defense to an attack on the decision's soundness.  The board's managerial decision making power, however, comes from § 141(a).  The judicial creation and legislative grant are related because the 'business judgment' rule evolved to give recognition and deference to directors' business expertise when exercising their managerial power under § 141(a).").

[101] *Id.* at 782 (citing S. Samuel Arsht, *The Business Judgment Rule Revisited*, 8 Hofstra L. Rev. 93, 97, 130–33 (1979)); 1 Stephen A. Radin, *The Business Judgment Rule*, at 17 (6th ed. 2009).

protect the authority of the board . . . ."[102]

> The power to hold to account is the power to interfere and, ultimately, the power to decide. If stockholders are given too easy access to courts, the effect is to transfer decisionmaking power from the board to the stockholders or, more realistically, to one or a few stockholders whose interests may not coincide with those of the larger body of stockholders. By limiting judicial review of board decisions, the business judgment rule preserves the statutory scheme of centralizing authority in the board of directors. In doing so, it also preserves the value of centralized decisionmaking for the stockholders and protects them against unwarranted interference in that process by one of their number. Although it is customary to think of the business judgment rule as protecting directors from stockholders, it ultimately serves the more important function of protecting stockholders from themselves.[103]

In so many words, the business judgment rule exists to reinforce and preserve directors' unique plenary authority.[104] Directors' decisions are afforded the protections of the business judgment rule in recognition of their managerial power

---

[102] Paul L. Regan, *The Unimportance of Being Earnest: Paramount Rewrites the Rules for Enhanced Scrutiny in Corporate Takeovers*, 46 Hastings L.J. 125, 137 (1994) (footnote and internal quotation marks omitted) (capitalization altered); *see also* Carol B. Swanson, *Juggling Shareholder Rights and Strike Suits in Derivative Litigation: The ALI Drops the Ball*, 77 Minn. L. Rev. 1339, 1360 (1993) ("Finally, the business judgment rule ensures that management remains in the hands of directors, rather than shareholders, perhaps 'protecting stockholders from themselves.'" (quoting Michael P. Dooley & E. Norman Veasey, *The Role of the Board in Derivative Litigation: Delaware Law and the Current ALI Proposals Compared*, 44 Bus. Law. 503, 522 (1989) [hereinafter "Dooley & Veasey"])).

[103] Dooley & Veasey at 522.

[104] *Cf.* Lyman Johnson, *Unsettledness in Delaware Corporate Law: Business Judgment Rule, Corporate Purpose*, 38 Del. J. Corp. L. 405, 413 (2013) ("[I]t is not settled today whether in cases involving corporate officers, judges will doctrinally deploy the business judgment rule in the same all-encompassing manner that it has been used for corporate directors." (footnote omitted)); *Macrophage Therapeutics, Inc. v. Goldberg*, 2021 WL 2582967, at *13 n.129 (Del. Ch. June 23, 2021) (same).

under 8 *Del. C.* § 141.[105]  The business judgment rule applies to directors' decisions because the directors, not anyone else, made those decisions.

When a derivative stockholder plaintiff makes decisions about a corporate asset, even decisions a director might otherwise make, she is not doing so with the authority granted by Section 141.  A derivative stockholder plaintiff does not have that centralized statutory authority that justifies judicial deference to her conduct.  Instead, she makes her decisions under discrete common law authority conditioned on clearing the hurdles of Rule 23.1 and *Zuckerberg*.[106]  The business judgment rule's purpose of protecting centralized authority from stockholder interference has no application to derivative stockholder plaintiffs:  in appointing a stockholder plaintiff, the Court has already determined that the board's plenary authority is properly second-guessed.[107]  While boards need insulation from stockholders'

---

[105] *Metro Storage*, 275 A.3d at 844; *Zapata*, 430 A.2d at 782 ("The board's managerial decision making power, however, comes from § 141(a).  The judicial creation and legislative grant are related because the 'business judgment' rule evolved to give recognition and deference to directors' business expertise when exercising their managerial power under § 141(a)."); *Aronson v. Lewis*, 473 A.2d 805, 812 (Del. 1984) ("The business judgment rule is an acknowledgment of the managerial prerogatives of Delaware directors under Section 141(a)." (citing *Zapata*, 430 A.2d at 782)), *overruled on other grounds by Brehm v. Eisner*, 746 A.2d 244 (Del. 2000).

[106] *Supra* notes 86 and 88.

[107] Dooley & Veasey at 522; Ct. Ch. R. 23.1(a) ("In a derivative action brought by one or more shareholders or members to enforce a right of a corporation or of an unincorporated association, *the corporation or association having failed to enforce a right which may properly be asserted by it . . . .*" (emphasis added)); *see also, e.g.*, *In re Walt Disney Co. Deriv. Litig.*, 825 A.2d 275, 286 (Del. Ch. 2003) ("Thus, [derivative] plaintiffs must plead

second-guessing to function properly, derivative stockholder plaintiffs rightly answer to their fellow stockholders and the Court.[108] The conduct of derivative stockholder plaintiffs is reviewed carefully to ensure their "interest[s] . . . coincide" with those of their fellow stockholders.[109] Derivative stockholder plaintiffs' limited

particularized facts sufficient to raise (1) a reason to doubt that the action was taken honestly and in good faith or (2) a reason to doubt that the board was adequately informed in making the decision."); *Hughes v. Hu*, 2020 WL 1987029, at *11 (Del. Ch. Apr. 27, 2020) ("If the business judgment rule protected the underlying transaction, then demand would not be futile, and the Rule 23.1 motion would be granted." (citing *Aronson*, 473 A.2d at 812)).

[108] Dooley & Veasey at 522; *Fuqua*, 752 A.2d at 129 ("[A] derivative plaintiff serves in a fiduciary capacity as representative of persons whose interests are in plaintiff's hands and the redress of whose injuries is dependent upon her diligence, wisdom and integrity." (citing *Katz*, 1981 WL 15148)); *Griffith*, 283 A.3d at 1138 ("Since *Katz* and *Youngman*, the Court of Chancery has implied an adequacy requirement in Rule 23.1 to maintain a derivative action." (collecting authorities)); *In re Wal-Mart Stores, Inc. Del. Deriv. Litig.*, 167 A.3d 513, 528 (Del. Ch. 2017) (describing how courts review whether derivative plaintiffs are "the best representative for the corporation and stockholders"); *see also supra* notes 89 and 90. Indeed, when a derivative plaintiff chooses to monetize a derivative claim in a settlement, the Court affords the other stockholders the opportunity to object, and itself is tasked with second-guessing the fairness of that monetization. *E.g.*, *Neponsit Inv. Co. v. Abramson*, 405 A.2d 97, 100 (Del. 1979) ("In determining whether or not to approve a proposed settlement of a derivative stockholders' action in these circumstances, the Court of Chancery is called upon to exercise its own business judgment.").

[109] Dooley & Veasey at 522; *In re S. Peru*, 52 A.3d at 767 n.5 (stating that the "derivative plaintiff 'must be qualified to serve in a fiduciary capacity as a representative of the class of stockholders, whose interest is dependent upon the representative's adequate and fair prosecution of the action'" (quoting *Emerald P'rs* , 564 A.2d at 673)); *Griffith*, 283 A.3d at 1138 ("Simply put, the plaintiff in a derivative action must be qualified to serve in a fiduciary capacity as a representative of a class, whose interest is dependent upon the representative's adequate and fair prosecution." (quoting *Youngman*, 457 A.2d at 379)); *see also supra* notes 89 and 90. Where a derivative claim is monetized by private ordering, the Court ensures the derivative plaintiff is answering to the other stockholders. Donald J. Wolfe, Jr. & Michael A. Pittenger, *Corporate and Commercial Practice in the Delaware Court of Chancery* § 13.03[f][1] at 13-28 to -29 (explaining the Court's "need to assure

29

agency authority does not carry the protections of the business judgment rule.

There is no basis to apply the business judgment rule to Defendants' decision not to return the Award to the Optimis board. Defendants can find no shelter in categorizing their actions as good faith business decisions.

### ii. Standard Of Conduct

For the same reasons that the Court reviews most director decisions under the business judgment rule, directors' duty of care is measured by the gross negligence standard. And for the same reasons, that more forgiving standard is reserved for directors. Derivative stockholder plaintiffs owe a duty of care under the simple negligence standard.

While corporate directors and derivative stockholder plaintiffs both owe fiduciary duties of care and loyalty in controlling a corporate asset, the standard of conduct governing their duties differs.[110] While "under the business judgment rule

---

that the interests of absent class members or stockholders have been fairly represented, and the necessity of guarding against the ever-present potential for surreptitious buyouts of representative plaintiffs at the expense of those whom they purport to represent" (footnotes omitted)).

[110] Restatement (Third) of Agency § 8.08 (2006) ("[A]n agent has a duty to the principal to act with the care, competence, and diligence normally exercised by agents in similar circumstances."); Restatement (Third) of Agency § 8.01 (2006) ("An agent has a fiduciary duty to act loyally for the principal's benefit in all matters connected with the agency relationship."); *Metro Storage*, 275 A.3d at 842 ("Directors of a Delaware corporation owe two fiduciary duties—loyalty and care. At a minimum, officers owe those same duties." (footnote omitted)); *cf. New Enter. Assocs. 14, L.P. v. Rich*, 2023 WL 3195927, at *15 (Del. Ch. May 2, 2023) ("Somewhat strangely, Delaware corporate law now stands as the

30

director liability is predicated upon concepts of gross negligence,"[111] agents like

derivative stockholder plaintiffs face liability for a breach of the duty of care for

simple negligence.[112] Agents owe "a duty to use reasonable care, competence, and

diligence, and the applicable standard takes into account any special skills or

knowledge possessed by the agent. A director's duty of care is different."[113] Under

Delaware law, directors must "inform themselves, prior to making a business

decision, of all material information reasonably available to them. And although

that standard speaks of reasonableness, under the business judgment rule director

---

bastion of traditional duties, even though director duties were less onerous than those of trustees and partners." (footnotes omitted)). "There are Delaware cases which assert errantly that an agency relationship, standing alone, does not give rise to fiduciary duties on the part of the agent. For a discussion of those cases, see *Metro Storage Int*[*ernationa*]*l LLC v. Harron*, 275 A.3d 810, 843 n.14 (Del. Ch. 2022)." *Harris v. Harris*, 289 A.3d 277, 298 n.10 (Del. Ch. 2023).

[111] *Metro Storage*, 275 A.3d at 844 (internal quotation marks omitted) (quoting *Aronson*, 473 A.2d at 812).

[112] *Cf. id.* at 845 ("Because of the different standards that govern the duty of care, a debate has long existed over whether an officer's duty of care would resemble the agency regime or the director regime. If the former applied, then an officer could be liable for simple negligence, like agents generally, and the analysis would take into account the officer's special knowledge or expertise. If the latter applied, then a more deferential standard, such as gross negligence, would apply, and the analysis would not take into account the officer's special knowledge or expertise."); *Triton Const. Co. v. E. Shore Elec. Servs., Inc.*, 2009 WL 1387115, at *23 (Del. Ch. May 18, 2009) ("To succeed on a claim for negligence, a plaintiff must demonstrate that the defendant owed a duty of care to the plaintiff; the defendant breached that duty; and the breach proximately caused injury to the plaintiff." (citing *New Haverford P'ship v. Stroot*, 772 A.2d 792, 798 (Del. 2001))), *aff'd*, 988 A.2d 938 (Del. 2010).

[113] *Metro Storage*, 275 A.3d at 844 (footnote omitted).

liability is predicated upon concepts of gross negligence."[114]  "Moreover, for purposes of a care claim, directors also generally are not held to a higher standard based on their special knowledge or expertise."[115]

Agents also operate under a more stringent duty of loyalty.  "Under a particularly well-developed body of fiduciary law, agents owe additional and more concrete duties [of loyalty] to their principal" than corporate directors owe to their corporation and its stockholders.[116]  A director's duty of loyalty "mandates that the best interest of the corporation and its shareholders takes precedence over any interest possessed by a director, officer or controlling shareholder and not shared by the stockholders generally,"[117] and "includes a requirement to act in good faith, which is 'a subsidiary element, i.e., a condition, of the fundamental duty of loyalty.'"[118]  Representative stockholder plaintiffs "owe[] the class a 'duty of the finest loyalty,' as [they have] undertaken to 'assert rights of others,'" whether those are stockholders' individual rights via a direct claim, or the company's rights via a

---

[114] *Id.* (alteration, internal quotation marks, and footnote omitted).

[115] *Id.* (collecting cases).

[116] *Id.* at 842–44.

[117] *Cede & Co. v. Technicolor, Inc.*, 634 A.2d 345, 361 (Del. 1993).

[118] *Metro Storage*, 275 A.3d at 842 (quoting *Stone ex rel. AmSouth Bancorporation v. Ritter*, 911 A.2d 362, 370 (Del. 2006)).

derivative claim.[119] They also have specific duties such as "a duty not to acquire a material benefit from a third party in connection with transactions conducted or other actions taken on behalf of the principal or otherwise through the agent's use of the agent's position."[120]

\* \* \*

Defendants moved for summary judgment on Plaintiff's breach of fiduciary duty claim on the theory that Defendants' conduct should be measured against a gross negligence standard and is protected by the business judgment rule; Defendants thought they would prevail under those more lenient standards. For the reasons stated, the business judgment rule applies to board decisions, not the

---

[119] *Straight Path*, 2022 WL 728844, at \*5 (footnotes omitted) (quoting *Steinhardt*, 2012 WL 29340, at \*8, and then quoting *OptimisCorp*, 2021 WL 2961482, at \*7)); Restatement (Third) of Agency § 8.01 (2006) ("An agent has a fiduciary duty to act loyally for the principal's benefit in all matters connected with the agency relationship."); *see supra* note 90.

[120] Restatement (Third) of Agency § 8.02 (2006); *id* § 8.01 cmt. b ("The general fiduciary principle stated in this section is an overarching standard that unifies the more specific rules of loyalty stated in §§ 8.02 to 8.05. Although an agent's interests are often concurrent with those of the principal, the general fiduciary principle requires that the agent subordinate the agent's interests to those of the principal and place the principal's interests first as to matters connected with the agency relationship."); *Straight Path*, 2022 WL 728844, at \*5 (holding representative plaintiffs "assume[] an obligation to [the class] to act with respect to the claims asserted loyally and not to seek or to obtain a private benefit by reason of the power resulting from such representative status" (internal quotation marks omitted)).

33

decisions of derivative plaintiffs,[121] and derivative plaintiffs owe more stringent fiduciary duties as agents.[122]

Defendants are left to argue they should not be held liable because: (i) "[n]o Delaware Court has ever held representative plaintiffs liable to the corporation for strategic decisions made in the course of pursuing successful derivative litigation"[123]; (ii) "Defendants never deprived Optimis of a corporate asset, but instead sought to protect [it] for Optimis'[s] innocent stockholders"[124]; (iii) "[t]he June 18, 2020 Order did not require the funds be remitted, nor did not grant injunctive relief"[125]; and (iv) Defendants acted with care, competence, and diligence as derivative plaintiffs by "secur[ing] a significant Award, over considerable opposition, which would not have been obtained without their efforts."[126] As I have already posited in this case, perhaps no Delaware court has found a representative plaintiff liable in such a way because no representative plaintiffs have tried to keep a derivative award for themselves, their friends, and their family.[127] And for reasons

---

[121] *Supra* notes 101 and 102, and accompanying text.

[122] *See supra* notes 113 and 116, and accompanying text.

[123] OB at 29.

[124] RB at 17–18.

[125] *Id.*

[126] *Id.* at 23.

[127] D.I. 96 at 18.

I will explain, regardless of Defendants' past performance, motivations, or interpretation of the Court's order, they breached their fiduciary duties.

Defendants do not prevail under the standards applicable to agents. Upon review of the undisputed facts under a simple negligence standard and an agent's duties of loyalty, I am compelled to enter summary judgment, sua sponte, in Optimis's favor on Count II. "[T]he state of the record is such that [Optimis] is clearly entitled to such relief."[128] My reasoning follows.

## 2. Defendants Breached Their Duty Of Care.

Plaintiff claims Defendants breached their duty of care by "failing to promptly release the derivative proceeds to Optimis;" "failing to seek judicial guidance regarding the payment of the derivative proceeds;" and "failing to hold the derivative proceeds in an interest-bearing account during the pendency of the dispute with Optimis."[129] "[I]n order to maintain an action sounding in negligence[,] . . . a plaintiff must demonstrate that (i) the defendant owed the plaintiff a duty of care; (ii) that the defendant breached that duty; and (iii) that the defendant's breach was the proximate cause of the plaintiff's injury."[130] As explained, derivative plaintiffs

---

[128] *Comet*, 980 A.2d at 1034 (citing *Stroud,* 606 A.2d at 81, and *Bank of Del.,* 528 A.2d at 1199).

[129] Am. Compl. ¶ 58.

[130] *Patton v. 24/7 Cable Co., LLC*, 2016 WL 6272552, *2 (Del. Super. Aug. 31, 2016) (citing *Pipher v. Parsell*, 930 A.2d 890, 892 (Del. 2007)).

owe a fiduciary duty "to act with the care, competence, and diligence normally exercised by [derivative plaintiffs] in similar circumstances," and must do so in accordance with "any special skills or knowledge" they have.[131] Agents have a duty to "act[] only within the scope of the agent's actual authority" and "to act reasonably and to refrain from conduct that is likely to damage the principal's enterprise."[132] "If an agent breaches the duty of good conduct, it is not a defense that the agent's performance has otherwise been satisfactory to the principal."[133] Here, while Defendants won the Award, they breached their fiduciary duties as derivative plaintiffs by obtaining and retaining the monetized derivative Award: the authority to manage that Award is vested in Optimis's board.

### i. Stockholders Have No Authority To Manage Monetized Derivative Claims.

Delaware law divests a board of its authority to manage a derivative claim only with the board's consent or if a stockholder asks the court for permission and meets a high burden. The stockholder must satisfy Rule 23.1 and the *Zuckerberg* test with particularity.[134] Even when a stockholder clears those hurdles and obtains

---

[131] *Triton Const.*, 2009 WL 1387115, at *23; *Metro Storage*, 275 A.3d at 844 (footnote and citation omitted); 3 Am. Jur. 2d Agency § 214.

[132] Restatement (Third) of Agency §§ 8.09–8.10 (2006).

[133] *Id.* § 8.10 cmt. b.

[134] *See, e.g.*, *supra* note 88 and accompanying text; *In re Citigroup Inc. S'holder Deriv. Litig.*, 964 A.2d 106, 120 (Del. Ch. 2009) ("The pleadings, however, are held to a higher

authority over a derivative claim, her control over the claim terminates when the claim is monetized. The monetized claim, i.e. the money derived from the enforcement of the corporation's right, belongs to the company and is controlled and managed just like the rest of the company's assets—by the board.[135] Derivative plaintiffs do not have authority to manage monetized claims.

Derivative stockholder plaintiffs do not have the authority to unilaterally distribute a derivative recovery pro rata, but they may influence the use of monetized claims by petitioning the court to order or approve a particular distribution. Under *In re El Paso Pipeline Partners Derivative Litigation*, stockholders may request the Court order pro rata distribution of a monetized derivative award instead of leaving

---

standard under Rule 23.1 than under the permissive notice pleading standard under Court of Chancery Rule 8(a).").

[135] Wright & Miller § 1840 n.2 ("The proceeds of a derivative action belong to the corporation as it is the real party in interest and is bound by the result of the suit." (citing *Ross v. Bernhard*, 396 U.S. 531 (1970)); *Ross*, 396 U.S. at 538–39 ("The corporation is a necessary party to the [derivative] action; without it the case cannot proceed. Although named a defendant, it is the real party in interest, the stockholder being at best the nominal plaintiff. The proceeds of the action belong to the corporation and it is bound by the result of the suit. The heart of the action is the corporate claim." (footnote omitted)); *see also Countrywide*, 2009 WL 846019, at *9 ("If derivative claims are to be viewed as assets of a company—and they are—then their treatment must be logically consistent with how other assets are treated."); 13 Fletcher Cyc. Corp. § 6028 (Sept. 2022 update) ("Any recovery in a derivative proceeding generally belongs to the corporation and not to the plaintiff or other shareholders."); *TW Servs., Inc. v. SWT Acq. Corp.*, 1989 WL 20290, at *8 n.14 (Del. Ch. Mar. 2, 1989) ("[A] corporation is not a New England town meeting; directors, not shareholders, have responsibilities to manage the business and affairs of the corporation, subject however to a fiduciary obligation."); *supra* note 86.

its use to the board's business judgment.[136] The Court will decide if circumstances like those enumerated in *El Paso* warrant stripping the board of its power to manage that corporate asset.[137] The Court's power to impose a pro rata distribution arises from its equitable powers to shape a remedy in equitable derivative actions; derivative plaintiffs have no such powers.[138] Even if successful under *El Paso*, the stockholder plaintiff does not manage the award.[139]

---

[136] 132 A.3d 67 (Del. Ch. 2015), *rev'd sub nom. on other grounds El Paso Pipeline GP Co., L.L.C. v. Brinckerhoff*, 152 A.3d 1248 (Del. 2016).

[137] *E.g.*, *id.* at 123–25 ("[1] Cases where the defendants are insiders who misappropriated corporate property such that an entity-level recovery would return the property to the wrongdoers' control. [2] Cases where an entity-level recovery would benefit 'guilty' stockholders, but an investor-level recovery could be more narrowly tailored to benefit only 'innocent' stockholders. [3] Cases where the entity is no longer an independent going concern, such that channeling the recovery through the corporation is no longer feasible or a pro rata recovery is more efficient." (footnotes and citations omitted) (formatting altered)); *id.* at 85 ("Although it is rare for a court to grant an investor-level recovery on an entity-level claim, ample authority establishes that such a remedy is possible."); *id.* at 119, 122–23, 128–29, 131 (characterizing pro rata distribution as a remedy); *see also, e.g.*, *Eshleman v. Keenan*, 194 A. 40, 43 (Del. Ch. 1937) ("That courts have the power in proper cases to compel the directors to declare a dividend, is sustained by respectable authorities."); *id.* ("If the case were one where the corporation had ceased to operate, its controlling stockholder had converted all of its assets and it was denuded of all of its property, it might be that the minority stockholders would be *entitled to a decree* against the culpable officer for payment to them of their equitable share of the assets which the defendant had in his possession." (emphasis added)); *El Paso*, 132 A.3d at 123 n.72 (providing examples where derivative plaintiffs sought a pro rata distribution of money damages when they filed their derivative claims (citing, inter alia, *Fischer v. Fischer*, 1999 WL 1032768, at *1, *3–4 (Del. Ch. Nov. 4, 1999), and then *Stevanov v. O'Connor*, 2009 WL 1059640, at *6 (Del. Ch. Apr. 21, 2009))).

[138] *El Paso*, 132 A.3d at 122–23, 126.

[139] *See Baker v. Sadiq*, 2016 WL 4375250, at *3 n.3 (Del. Ch. Aug. 16, 2016) ("By contrast, courts rarely deploy the transitive property to convert what otherwise would be an

### ii. Defendants Breached Their Fiduciary Duties By Intercepting The Award.

The facts here are unusual. In a typical derivative suit, the recovery is paid to the company as the nominal defendant.[140] Optimis did not appear as a party to the Arbitration, so while the Award is derivative, the arbitrator ordered the Award paid to "the prevailing party" of the derivative claims.[141] Defendants never should have held the monetized Award: it belonged to Optimis and should have been managed by its board.

In intercepting the Award, Defendants breached their duties to Optimis in three ways. First, even before Sussman wired the Award to Bayard, Optimis instructed Defendants, their agents, to direct the monetized Award to Optimis. Agents have a duty to "comply with all lawful instructions received from the principal," even if "the agent believes that doing otherwise would be better for the principal."[142] As the October 31 date for filing to confirm the Award loomed,

---

entity-level recovery into an investor-level recovery." (citing *El Paso*, 132 A.3d at 75)); *El Paso*, 132 A.3d at 75 ("[S]ubstantial authority supports a court's ability to grant a *pro rata* recovery on a derivative claim. Such a recovery is the exception, not the rule, but it is possible.").

[140] *El Paso*, 132 A.3d at 120; *Tooley v. Donaldson, Lufkin & Jenrette, Inc.*, 845 A.2d 1031, 1036 (Del. 2004) ("Because a derivative suit is being brought on behalf of the corporation, the recovery, if any, must go to the corporation.").

[141] Arb. Award at 86.

[142] Restatement (Third) of Agency §§ 8.09–8.10 (2006); *id.* § 8.09 cmt. c; 3 Am. Jur. 2d Agency § 218 ("[E]ven though the principal and agent have previously agreed otherwise,

Optimis repeatedly expressed that the Award was a Company asset that should be wired to the Company's counsel, not Defendants' counsel.[143] Yet on October 31, the Award was transferred to Bayard's IOLTA account, in contravention of the Company's instructions.[144] By refusing to follow Optimis's instructions to remit the monetized award to Optimis—which only Optimis's board had authority to manage—Defendants breached their fiduciary duties.

Second, Defendants failed to forthrightly communicate with Optimis, their principal, about their interception of Optimis's Award.

---

an agent has a duty to comply with lawful instructions received from the principal. This is so although the agent believes that doing otherwise would be better for the principal.").

[143] AB Ex. 15 at ASW_2020-0183_00003665 ("Please be advised that I am not authorized to sign any iteration of the 'Confidentiality Agreement' that does not provide for the arbitration proceeds being wired directly into my firm's trust account."); *id.* at ASW_2020-0183_00003664 ("I have a duty to protect my clients' interests and my clients, in turn, have an uncompromising fiduciary duty to protect the interests of the shareholders and the corporate enterprise at large. . . . [T]he derivative claims and the resulting derivative recovery at issue here are assets that belong exclusively to Optimis.").

[144] RB Ex. 22 at BAYARD000348; *see* Restatement (Third) of Agency § 8.09 (2006) ("(1) An agent has a duty to take action only within the scope of the agent's actual authority. (2) An agent has a duty to comply with all lawful instructions received from the principal and persons designated by the principal concerning the agent's actions on behalf of the principal.").

An agent has a duty to use reasonable effort to provide the principal with facts that the agent knows, has reason to know, or should know when (1) subject to any manifestation by the principal, the agent knows or has reason to know that the principal would wish to have the facts or the facts are material to the agent's duties to the principal; and (2) the facts can be provided to the principal without violating a superior duty owed by the agent to another person.[145]

Defendants were nonresponsive to Optimis's questions about their possession of and plans for the Award. Within weeks of the Amended Final Award, at the latest, Optimis's counsel reached out to Bayard to inquire about the Award.[146] By October 31, Bayard held the Award in its IOLTA account.[147] Defendants did not clearly communicate to Optimis that they had in fact agreed to a deal with their arbitration opponents, over Optimis's rejection of those terms, and that they had wired the Award to Bayard.[148] After Bayard held the Award, Defendants ignored

---

[145] Restatement (Third) of Agency § 8.11 (2006); *see also Lewis v. Vogelstein*, 699 A.2d 327, 334 (Del. Ch. 1997) ("[S]ince the relationship between a principal and agent is fiduciary in character, the agent . . . must act not only with candor, but with loyalty.").

[146] *Supra* note 25.

[147] RB Ex. 22 at BAYARD000348.

[148] *Compare* AB Ex. 15 at ASW_2020-0183_00003665 ("The final award requires the award to be paid to Claimants and Mr. Sussman already agreed to make that payment to my firm's escrow account in order to secure the 60-day extension we already provided."), *with, e.g.*, OB Ex. 8 at 24–25 (responding to interrogatory number 11, "Optimis states that counsel to defendants in the Derivative Action learned that the derivative award was expected to be paid to Defendants in late October 2019, as reflected in emails and correspondence among and between counsel for defendants in the Derivative Action and Defendants' counsel. Optimis'[s] officers learned that the derivative award was actually paid to Defendants shortly thereafter, as reflected in emails and correspondence among and between counsel for defendants in the Derivative Action and Defendants' counsel, to include without limitation, Defendants' counsel's letter to John G. Harris, Esq., dated

Optimis's counsel's repeated ask for "written assurances that Bayard will not distribute any portion of the Award, directly or indirectly, to Messrs. Waite, Atkins, and/or Smith, or any other party or person, absent a court order authorizing any such distribution."[149] Not only did Defendants not provide these assurances, but it appears Defendants did not tell Optimis that Bayard took possession of the Award until the November 13 "Notice of Distribution."[150] Defendants failed to use reasonable efforts to respond to Optimis's questions about the Award even though they "kn[ew] or ha[d] reason to know that [Optimis] wish[ed] to have the facts" about the Award.[151]

---

November 13, 2019 . . . ."); AB Ex. 15 at ASW_2020-0183_00003664 (Optimis's then-counsel's October 29, 2019 email urging Defendants' counsel not to intercept the Arbitration Award); AB Ex. 17 at OPTIMIS_037877 (Optimis's then-counsel's November 13 email asking: "Or worse, have you released any of the Award proceeds either to your firm or your clients. Please advise."). *But see* OB Ex. 8 at 23–24 (responding to interrogatory number 10, "Optimis states that counsel to defendants in the Derivative Action learned that the derivative award was anticipated to be paid to Defendants acting as fiduciaries of Optimis, when the Arbitrator issued the Interim Award, and that Optimis'[s] officers learned this information shortly thereafter. Counsel to defendants in the Derivative Action subsequently learned that the Award was to be paid to Defendants, acting as fiduciaries of Optimis, when the Arbitrator issued the Amended Final Award, and Optimis'[s] officers learned shortly thereafter.").

[149] AB Ex. 17 at OPTIMIS_037877 (internal quotation marks omitted); *see also id.* at OPTIMIS_037877 ("Are you refusing to offer such assurance? Or worse, have you released any of the Award proceeds either to your firm or your clients. Please advise.").

[150] *Id.* at OPTIMIS_037885–86; OB Ex. 8 at 25.

[151] Restatement (Third) of Agency § 8.11(1) (2006).

Finally, once they obtained the Award, Defendants breached their duty to return it to Optimis's board. As explained, Defendants lacked any authority over, or right to possess, the monetized Award. Even when acting outside of the scope of their authority or term of their relationship, agents owe a duty to their principal to return property they receive on the principal's behalf and a duty "to refrain from conduct that is likely to damage the principal's enterprise."[152] "An agent has a duty, subject to any agreement with the principal, not to deal with the principal's property so that it appears to be the agent's property."[153] Even if an agent has the authority to collect money for the principal, she has a duty to return it to the principal on

[152] *Id.* § 8.10; *cf. id.* § 8.12 cmt. d ("Following termination, an agent continues to have a duty to account to the principal for all that the agent receives on the principal's account. An agent satisfies this duty by acting in accord with any agreement with the principal and, otherwise, by acting reasonably in light of custom and practice in the agent's industry and the nature of the agent's engagement."); *see also id.* § 8.10 cmt. b ("The nature of the principal's activities and the agent's position, as well as manifestations of the principal, are relevant to whether an agent is subject to a duty to refrain from particular conduct. An agent's duty to refrain from engaging in conduct may extend to conduct that, although it is beyond the scope of activity encompassed by the agency relationship itself, is nonetheless closely connected to the principal or the principal's enterprise and is likely to bring the principal or the principal's enterprise into disrepute. If an agent breaches the duty of good conduct, it is not a defense that the agent's performance has otherwise been satisfactory to the principal."); *cf.* Restatement (Second) of Agency § 422 (1958) ("Unless otherwise agreed, an agent who has charge of land or chattels for his principal is subject to a duty to the principal to use reasonable care in their protection, to use them only in accordance with the directions of the principal and for his benefit, and to surrender them upon demand or upon the termination of the agency."); *id.* § 423 ("Unless otherwise agreed, an agent who holds the title to something for the principal is subject to a duty to the principal to use reasonable care in the protection of the title which he so holds, to act in accordance with the directions of the principal, to use it only for the principal's benefit, and to transfer it upon demand or upon the termination of the agency.").

[153] 3 Am. Jur. 2d Agency § 223.

demand.[154] And Defendants "continue[d] to have a duty" to act in accordance with the "custom and practice" of derivative plaintiffs and in "the nature of" Defendants' role as derivative plaintiffs.[155]

Instead of remitting the Award to Optimis, Defendants held tightly to it, delaying the day of reckoning in this Court and resisting returning the Award to Optimis and the board's proper control.[156] Once they secured the Award in their counsel's trust account, Defendants spent months opposing the prompt consideration of Optimis's request for relief, asserting that the Award was not derivative, that

---

[154] Restatement (Second) of Agency § 427 cmt. b (1958) ("Unless the agent has a lien upon the proceeds or is otherwise entitled only to a part of the amount collected, the agent has a duty to pay money collected to the principal upon demand by him. If the amount due the principal is unascertained, and its ascertainment is within the agent's power, the agent ordinarily has a duty to ascertain the amount promptly. Even if the exact amount due cannot be ascertained, he has the duty to pay to the principal upon the principal's demand the amount to which the principal is clearly entitled."); *id.* ("Unless otherwise agreed, an agent who has received goods or money for the principal has a duty to use care to keep them safely until they are remitted or delivered to the principal, and to deliver them to the principal upon his demand when the amount due him has been ascertained. The agent may also have a duty to use care to notify the principal of the collection, or to remit the goods or money to him within a reasonable time."); *cf. Phansalkar v. Anderson Weinroth & Co., L.P.*, 344 F.3d 184 (2d Cir. 2003) (affirming a trial court decision which found that an investment banker breached fiduciary duty by withholding from employer cash and securities received from clients that belonged to employer).

[155] Restatement (Third) of Agency § 8.10 cmt. b (2006); *cf. id.* § 8.12 cmt. d.

[156] *See, e.g.*, AB Ex. 27 at OPTIMIS_065161–62 ("As Mr. Price had previously informed the Board, there was an arbitration award issued in April in the Sussman derivative action that was revised [in September]. Mr. Price explained that the amount of $6.7MM had been awarded to the Company. Steve Brauerman, one of the lawyers for Waite, Atkins and Smith, seems to be trying to delay the process for the Company to recover the arbitration award.").

Bayard was entitled to additional fees, and that the Court could not oblige them to return the Award. Nearly seven months after the issuance of the Amended Final Award—eleven months after the initial Interim Award—Defendants were forced to oppose Plaintiff's motion for partial judgment on the pleadings, and finally asked this Court to approve pro rata distribution under *El Paso*.[157]

In summary, by "failing to promptly release the derivative proceeds to Optimis," "failing to seek judicial guidance regarding the payment of the derivative proceeds," and failing to remit the Award even after a declaratory judgment was entered in Optimis's favor, Defendants breached their duty to Optimis. The moment the derivative claim against Sussman was monetized, the claim became Company property, and Defendants' authority over that claim ceased. Defendants could have sought the Award's pro rata distribution under *El Paso* by asking a tribunal; but they

---

[157] *Compare* Arb. Award (issuing the Amended Final Award on September 12, 2019), *with* D.I. 32 at 22, 25–29 (arguing in a brief dated May 14, 2020, that Defendants should be able to distribute the Award on a pro rata basis under *El Paso*). Indeed, the parties' stipulation and proposed scheduling order regarding briefing on Plaintiff's motion for partial judgment on the pleadings did not contemplate Defendants filing a cross-motion. D.I. 27. Defendants did not seek a "judicial resolution" to withhold the Award so that it may be distributed pro rata until April 2, 2020. Countercl. ¶¶ 21–22, 34–37, 47–49. *Compare* Arb. Award (issuing the Amended Final Award on September 12, 2019), *and* OB Ex. 9 at ASW_2020-0183_00002753 (issuing the Interim Award on April 29, 2019), *with* Countercl. (filing counterclaims seeking a declaration permitting Defendants to distribute the Arbitration Award pro rata on April 2, 2020). While Defendants suggested a pro rata distribution was possible under *El Paso* in their March 2, 2020 opposition to Optimis's motion for entry of an order to show cause in the Derivative Action, they waited over two more months to seek permission. Deriv. Action at D.I. 209.

chose a different path. Defendants negotiated to usurp the Company's authority over and possession of the Award first without their principal's knowledge or permission, then against their principal's instructions, and without adequately communicating with their principal. Once Defendants possessed the Award, they improperly treated it as their own and refused to return it. Defendants rebuffed Optimis's efforts to seek the Award's return every step of the way, eventually professing an intention to distribute the derivative proceeds not to the Company but to stockholders they deemed "innocent." Then Defendants waited nearly seven months to even ask the Court whether such pro rata distribution was appropriate.[158]

Defendants exceeded the scope of their authority as derivative plaintiffs, violated their duty to act with the care, competence, and diligence of derivative plaintiffs, and breached their duty of care as agents. Defendants were negligent. Plaintiff's list of purportedly disputed facts offered to refute Defendants' Motion does not bear on those issues.[159] Applying the law to the undisputed record before me, Defendants breached their duty of care.

Finally, Plaintiff contends Defendants breached their fiduciary duties by failing to hold the Award in an interest-bearing account. Defendants never should have held the Award in the first place: they had no authority to do so. A derivative

---

[158] *Supra* note 157.

[159] AB at 35–37.

plaintiff does not owe a duty to earn money for the company on an unremitted derivative award.[160]  Defendants did not breach their duty of care by "failing to hold the derivative proceeds in an interest-bearing account during the pendency of the dispute with Optimis."[161]  Plaintiff may raise the forgone possibility of interest in its trial presentation as to damages.[162]

### iii.    Defendants' Breaches Damaged Optimis.

The final element that a plaintiff must establish to prevail on a breach of care claim against an agent is that the agent's "breach was the proximate cause of the plaintiff's injury."[163]   "Proximate cause is defined as, 'that direct cause without which the [injury] would not have occurred.'"[164]  Whether a plaintiff was injured as

---

[160] *See JER Hudson GP XXI LLC v. DLE Invs., LP*, 275 A.3d 755, 799 (Del. Ch. 2022) ("A fiduciary cannot breach a duty it does not owe.").

[161] Am. Compl. ¶ 58.

[162] *See United States v. Patty*, 992 F.2d 1045, 1050 (10th Cir. 1993) ("Prejudgment interest reflects the victim's loss due to his inability to use the money for a productive purpose, and is therefore necessary to make the victim whole.  This is especially true when, as in this case, the victim is a financial institution because "[f]oregone interest is one aspect of the victim's actual loss.'" (alteration in original) (quoting *United States v. Smith*, 944 F.2d 618, 626 (9th Cir. 1991))); *Citrin v. Int'l Airport Ctrs. LLC*, 922 A.2d 1164, 1167 (Del. Ch. 2006) ("A central purpose of pre-judgment interest is to ensure that a plaintiff to whom payment was owed does not suffer injury by the defendant's unjustified delay.  By requiring the defendant to pay a fair rate of interest during the period of unjustifiable delay, pre-judgment interest helps make the plaintiff more whole, while depriving the defendant of a windfall." (citing *Finkelstein v. Liberty Digital, Inc.*, 2005 WL 1074364, at *26 (Del. Ch. Apr. 25, 2005))).

[163] *See Patton*, 2016 WL 6272552, *2 (citing *Pipher*, 930 A.2d at 892).

[164] *Spencer v. Goodill*, 17 A.3d 552, 554 (Del. 2011) (alteration in original) (quoting *Chudnofsky v. Edwards*, 208 A.2d 516, 518 (Del. 1965)).

a result of a defendant's negligence is a different inquiry than the amount of damages incurred.[165]

Defendants' breaches of their duty of care caused damage to Optimis. The nine-month delay in receiving the bulk of the Award proximately injured Optimis by depriving them of an asset to which they had a right.[166] As explained, Optimis had a right to the Award; the record is undisputed that Optimis was deprived of it and felt the pain of that deprivation.[167] For purposes of establishing liability, that is enough.

Defendants raise a conclusory and narrow dispute as to whether loans Optimis took out while awaiting the Award were "reasonably foreseeable []or proximately caused by Defendants' conduct."[168] Whether the Award's delay caused Optimis to

---

[165] *See Dickerson v. Murray*, 2016 WL 1613286, at *3 (Del. Super. Mar. 24, 2016) ("The test of whether damages are remote or speculative has nothing to do with the difficulty in calculating the amount, but deals with the more basic question of whether there are identifiable damages. Thus, damages are speculative only if the uncertainty concerns the *fact* of damages rather than the amount." (internal quotation marks omitted) (quoting *Pashak v. Barish*, 450 A.2d 67, 69 (Pa. Super. 1982))).

[166] *Compare* Arb. Award (issuing the Amended Final Award on September 12, 2019), *with* D.I. 49 (returning $5,211,789.70 of the Award to Optimis on June 26, 2020). *E.g.*, *Dickerson*, 2016 WL 1613286, at *4 ("[T]he fact that the plaintiff may recover from the buyers does not negate the fact that he was deprived of a security interest he would have received but for the defendants' negligence.").

[167] *E.g.*, *OptimisCorp*, 2021 WL 2961482, at *4; Atkins Aff. ¶¶ 20–21, 23; Smith Aff. ¶¶ 19–20, 22; Waite Aff. ¶¶ 18–19, 21; *supra* notes 25, 38 and 39, and accompanying text.

[168] OB at 44. Defendants claim in their reply brief that Optimis did not respond to this argument (RB at 34–35), but Plaintiff's brief does argue that "once it became apparent that the Award was not forthcoming, [the Company] was forced to take out various emergency

48

enter into interim loans is not material to the broader conclusion, supported by undisputed facts, that the delay was painful to Optimis. The deprivation of Optimis's corporate asset is sufficient injury to find Defendants liable on Count II.[169] Whether the cost of those loans is included in a damages award will be dealt with at trial.

### 3. Defendants Breached Their Duty Of Loyalty.

Plaintiff claims Defendants breached their duty of loyalty. Plaintiff alleges that in failing to remit the Award to Optimis, Defendants breached their fiduciary duties by "seeking to extract personal benefits for themselves to the exclusion of other stockholders of Optimis" and "inflicting economic injuries on Optimis."[170]

Defendants owed a duty of loyalty to Optimis and its stockholders in their role as derivative claimant.[171] "Under fundamental principles of agency law, an agent

---

loans at unfavorable interest rates to replace the Award, which, at that point, the Company was counting on to meet critical working capital needs." AB at 28.

[169] The concrete nature of the Company's injury—deprivation of a monetized derivative award, an asset over which derivative plaintiffs have no lawful control—is unique and makes Optimis's claim more viable than other conceivable claims that a derivative plaintiff was negligent.

[170] Am. Compl. ¶ 58; *id.* ¶ 57. In paragraph 58 of the Amended Complaint, Plaintiff characterizes these breaches as of Defendants' duty of care. *Id.* ¶ 58. But, read together with paragraph 57, I will interpret these allegations as breaches of Defendants' duty of loyalty as Defendants have. *Id.* ¶ 57; OB at 34 (arguing Plaintiff cannot establish a breach of loyalty because "Plaintiff's remaining breach theories—that Defendants personally benefitted from the Award or harmed Optimis to extract a personal benefit have no record support").

[171] *Supra* notes 89 and 90 and accompanying text. Defendants do not dispute they owed a fiduciary duty of loyalty to Optimis's stockholders. *Cf.* OB at 27 n.3.

49

owes his principal a duty of good faith, loyalty, and fair dealing."[172] Agents also have a duty "not to use property of the principal for the agent's own purposes or those of a third party."[173] "[I]n undertaking to assert rights of others," a representative plaintiff "assumes an obligation to such persons to act with respect to the claims asserted loyally and not to seek or to obtain a private benefit by reason of the power resulting from such representative status."[174] Specifically, a derivative

---

[172] *Triton Const.*, 2009 WL 1387115, at *9 (citing *Sci. Accessories Corp. v. Summagraphics Corp.*, 425 A.2d 957, 962 (Del. 1980), and Restatement (Second) of Agency § 387 (1957), and Restatement (Third) of Agency § 1.01 cmt. e (2006)), *aff'd*, 988 A.2d 938 (Del. 2010); *Schock v. Nash*, 732 A.2d 217, 226 n.24 (Del. 1999) ("The fiduciary relationship existing between an agent and his principal has been compared to that which arises upon the creation of a trust, and the rule requiring an agent to act with the utmost good faith and loyalty toward his principal or employer applies regardless of whether the agency is one coupled with an interest, or the compensation given the agent is small or nominal or that it is a gratuitous agency." (internal quotation marks omitted) (quoting 3 Am. Jur. 2d Agency § 210 (1986))).

[173] Restatement (Third) of Agency § 8.05(1) (2006); *see also id.* § 8.12(1) ("An agent has a duty, subject to any agreement with the principal, (1) not to deal with the principal's property so that it appears to be the agent's property[.]").

[174] *Lacos Land Co. v. Arden Gp., Inc.*, 1986 WL 14525, at *3 (Del. Ch. Dec. 24, 1986) (citing *Wied v. Valhi, Inc.*, 466 A.2d 9 (Del. 1983)); *see also* Restatement (Third) of Agency § 8.02 cmt. a (2006) ("[A]n agent has a duty not to acquire material benefits in connection with transactions or other actions undertaken on the principal's behalf or through the agent's use of position."); *Latesco, L.P. v. Wayport, Inc.*, 2009 WL 2246793, at *6 (Del. Ch. July 24, 2009) ("The claim essentially arises out of agency law, which holds that an agent may not acquire a material benefit (other than from his principal) in connection with his position as agent.").

plaintiff "may not trade any aspect of the claims asserted derivatively for a strictly personal benefit."[175]

Plaintiff asserts Defendants withheld the Award "to extract personal benefits for themselves to the exclusion of other stockholders of Optimis."[176] Defendants claim they "s[ought] to protect the Award for the Company's Innocent Stockholders."[177] According to Defendants' grouping, "Innocent Stockholders" expressly excluded "the Individual Defendants in the Delaware Derivative Action," but included "friends and family of Defendants William Atkins, Gregory Smith, and John Waite."[178] Defendants do not dispute that they withheld the Award to benefit themselves, and their friends and family, to the exclusion of any Optimis stockholder

---

[175] *Lacos Land*, 1986 WL 14525, at *4 (citing *Wied*, 466 A.2d at 15); *cf. Stegemeier v. Magness*, 728 A.2d 557, 563 (Del. 1999) ("Unlike corporate law, '[u]nder trust law, self-dealing on the part of a trustee is virtually prohibited.'" (alteration in original) (quoting *Oberly v. Kirby*, 592 A.2d 445, 466 (Del. 1991))).

[176] Am. Compl. ¶ 58.

[177] OB at 14 (capitalization altered); *see also id.* at 1–2, 14–16, 25, 29–31, 33, 35, 38, 40–42, 54; RB at 7, 13, 16–21, 23, 29–30; Atkins Aff. ¶¶ 23–24; Smith Aff. ¶¶ 22–23; Waite Aff. ¶¶ 21–22; Smith Dep. at 38–41; Waite Dep. at 92; Atkins Dep. at 48–49.

[178] OB at 1; RB at 7 ("Defendants' motivation, to extent it is even relevant, is not disputed. 'Whether Defendants planned, as they contend, to distribute the Award to stockholders other than themselves and their "friends and family," and the particulars of any such plan.' The record evidence confirms that Defendants desired to distribute the Award to Optimis'[s] innocent stockholders and sought a declaration from this Court to permit them to do so." (emphasis and citations omitted)); Countercl. at 41 ¶ A (seeking an order "ordering the distribution of the Award to all Optimis Stockholders except for the Individual Defendants in the Delaware Derivative Action, including any entities controlled by the Individual Defendants").

they did not consider "innocent."[179]  As explained, Defendants did not have the authority to decide how to distribute the Award, and they failed to properly secure a pro rata distribution from the arbitrator, or any court including this one, before co-opting the board's power over the Award and the Award itself for themselves.  I conclude Defendants breached their duty of loyalty by withholding the Award with the express intention of benefitting themselves, their friends, and family to the exclusion of other Company stockholders.

The reasons why Defendants pursued this self-interested distribution are disputed.  Plaintiff claims Defendants knew that Optimis was struggling financially, so they withheld the Award to exacerbate that financial pain.[180]  The record is mixed on what Defendants knew about Optimis's financial condition.[181]  Plaintiff also

---

[179] Defendants' counsel also represented during oral argument that his clients' motivation for withholding the Arbitration Award should not be characterized as personal animus, but rather:  "'I sold an incredibly valuable company that was spitting off $6 million a year, I got worthless stock out of it, have never gotten a return on that investment or any value for the company that I sold to Mr. Morelli for essentially nothing, and I'm attempting to get a return on the economic value that I put into that, that my stock is worth.'  Especially after succeeding in a substantial judgment against one of the wrongdoers who acted with Mr. Morelli."  Hr'g Tr. 18.  In spite of this representation by Defendants' counsel, Plaintiff did not raise this theory of self-dealing, so I decline to consider it on this Motion.

[180] AB at 4, 15, 32–34, 45, 47, 52–53.

[181] *Compare, e.g.*, OB at 58 ("Defendants were not aware of Plaintiff's financial state and had no reason to know that Plaintiff would purportedly suffer any damages in this timeframe."), *with, e.g., id.* at 15 ("[Optimis] had incurred massive debt to attorneys and things, and I wanted the shareholders to have a chance, if there was any—anything left." (quoting Atkins Dep. at 48)); *see also* Atkins Aff. ¶ 28 ("At the time the Award was paid into Bayard's account, other than generally knowing that Optimis carried substantial debt,

52

claims Defendants' withholding and proposed partitioning of the Award is based on personal animus towards the board and is a bad faith violation of Defendants' duty of loyalty.[182] Defendants broadly dispute their actions were motivated by personal animus.[183] But these disputes are immaterial to the foundational conclusion that Defendants withheld the Award without authority to do so to favor themselves, their friends, and their family in breach of their duty of loyalty. That conclusion is enough to support summary judgment in Plaintiff's favor.

* * *

This Court has "inherent authority" to grant the Motion sua sponte against Defendants as to Count II.[184] Defendants owed fiduciary duties to Plaintiff and its stockholders. It is undisputed that Defendants secretly negotiated to divert the Award from Optimis to their counsel; refused to answer Optimis's questions about their plans for the Award or follow Optimis's instructions; did not ask the arbitrator

---

particularly owed to lawyers that it had used in the past, I had no understanding of what Optimis'[s] financial condition was or whether the Company was experiencing any liquidity issues."); Smith Aff. ¶ 27 (same); Waite Aff. ¶ 26 (same).

[182] AB at 5, 35, 39–40; Hr'g Tr. 53, 72.

[183] RB at 6–7; Hr'g Tr. 16–21, 40; *id.* 20 ("ATTORNEY BRAUERMAN: . . . But I don't think it can be a disputed fact because there's absolutely no evidence of personal animus in this case.").

[184] *Comet*, 980 A.2d at 1034 ("The court has inherent authority to grant summary judgment *sua sponte* against the moving party, but should only do so when the state of the record is such that the non-moving party is clearly entitled to such relief." (citing *Stroud,* 606 A.2d at 81, and *Bank of Del.*, 528 A.2d at 1199)).

or this or any court before usurping the Award; and resisted returning the Award even after the Court ruled the Award was not theirs. Defendants exceeded their authority as derivative plaintiffs by purporting to manage a monetized derivative award, and breached their duty of care. It is also undisputed that Defendants withheld the Award to distribute it to themselves, their friends, and their family to the exclusion of Optimis stockholders Defendants did not deem "innocent." Defendants breached their duty of loyalty. Defendants' breaches caused damage to Optimis. For the foregoing reasons, Defendants' Motion is **DENIED** as to Count II and summary judgment is **GRANTED** in Plaintiff's favor as to liability.

### 4. The Motion Is Denied As To Damages.

The Court "maintains the discretion to deny summary judgment if it decides that a more thorough development of the record would clarify the law or its application."[185] Court of Chancery Rule 56 (c) provides: "A summary judgment, interlocutory in character, may be rendered on the issues of liability alone although there is a genuine issue as to the amount of damages, or some other matter."[186] Plaintiff raised disputes of material fact regarding the amount of damages.[187] Issues

---

[185] *Tunnell v. Stokley*, 2006 WL 452780, at *2 (Del. Ch. Feb. 15, 2006) (internal quotation marks omitted) (quoting *Cooke v. Oolie*, 2000 WL 710199, at *11 (Del. Ch. May 24, 2000)).

[186] Ct. Ch. R. 56(c).

[187] AB at 37.

in that regard that require further development at trial. Consequently, I decline to rule on any damages associated with Count II on this Motion.

## B. The Motion Is Granted As To Count III.

Count III alleges that "[b]y withholding the derivative proceeds from Optimis, Defendants unjustly enriched themselves with ill-gotten benefits to the detriment of Optimis, while also causing other direct and indirect harm to Optimis on a significant scale."[188] Defendants seek a summary judgment on Count III, arguing Plaintiff cannot establish any of the elements of an unjust enrichment claim.[189] Under Delaware law, "[u]njust enrichment is the unjust retention of a benefit to the loss of another, or the retention of money or property of another against the fundamental principles of justice or equity and good conscience."[190] To state a claim for unjust enrichment a plaintiff must prove: "(1) an enrichment, (2) an impoverishment, (3) a relation between the enrichment and impoverishment, and (4) the absence of justification."[191]

---

[188] Am. Compl. ¶ 64.

[189] OB at 45–57.

[190] *Palese v. Del. State Lottery Office*, 2006 WL 1875915, at \*5 (Del. Ch. June 29, 2006) (internal quotation marks omitted) (quoting *ID Biomedical Corp., v. Tm Techs., Inc.*, 1995 WL 130743, at \*15 (Del. Ch. Mar. 16, 1995)), *aff'd*, 913 A.2d 570 (Del. 2006).

[191] *Riverside Risk Advisors LLC v. Chao*, 2022 WL 14672745, at \*28 (Del. Ch. Oct. 26, 2022) (citing *Garfield ex rel. ODP Corp. v. Allen*, 277 A.3d 296, 341–51 (Del. Ch. 2022)). In *Garfield*, this Court clarified that, absent a dispute over jurisdiction, "the absence of a remedy at law" is not a necessary fifth element of a claim of unjust enrichment. 277 A.3d at 346–51; *Parseghian as trustee of Gregory J. Parseghian Revocable Tr. v.*

An enrichment "must not be speculative, attenuated, or too indirect to support a relationship to the loss."[192] The Delaware Supreme Court explained "[t]he implicit purpose of the 'direct relationship' requirement is to ensure that a court accurately can reverse the unjust retention of a benefit to the loss of another. Where the relationship between the impoverishment and enrichment is attenuated or speculative, the court has no such assurance."[193]

Here, the alleged enrichment is too attenuated. Plaintiff does not contend Defendants' enrichment is based on possessing the Award itself (because it was in Defendants' counsel's account). Rather, Plaintiff looks to the butterfly effects from the combination of the withheld Award and the levy Atkins and Smith's collections agency filed against Optimis's main operating unit, Rancho.[194] Plaintiff says these actions put Rancho under financial strain.[195] Plaintiff theorizes that the physical therapy market in California is so tight that any negative force on Rancho necessarily

---

*Frequency Therapeutics, Inc.*, 2022 WL 2208899, at *9 (Del. Ch. June 21, 2022) ("The fifth element is not actually an element of the claim, but rather, an element that must be satisfied to obtain equitable jurisdiction over an unjust enrichment claim." (citing *Garfield*, 277 A.3d at 348)).

[192] *LVI Gp. Invs., LLC v. NCM Gp. Hldgs., LLC*, 2019 WL 7369198, at *31 (Del. Ch. Dec. 31, 2019) (citing *Vichi v. Koninklijke Philips Elecs. N.V.*, 62 A.3d 26, 60–61 (Del. Ch. 2012)).

[193] *Vichi*, 62 A.3d at 61.

[194] AB at 30–31, 47, 49, 53–55; Hr'g Tr. 63.

[195] AB at 30–31, 47, 53–54; AB Ex. 25 at 18–21; AB Ex. 27 at OPTIMIS_065160; AB Ex. 28 at OPTIMIS_0065168–69; Hr'g Tr. 63.

56

benefits its competitor, All-Star—which Defendants own.[196]  Plaintiff theorizes

Rancho's strain raised All-Star's net worth, which attracted the attention of a buyer,

Confluent Health.[197]  Confluent Health purchased All-Star:  Plaintiff theorizes

Defendants, as All-Star principals, profited.[198]

Defendants dispute Plaintiff's extrapolations of their gain from Rancho's

pain.[199]  Defendants focus their challenge on the final step:  extending any benefit

from nonparty All-Star to Defendants.[200]  Plaintiff did not point to any facts

extending that benefit to Defendants, but rather promised it would prove it at trial.

The time to show it could meet its burden was on this Motion.[201]  Plaintiff has failed

---

[196]  AB at 30, 47, 53–54; AB Ex. 27 at OPTIMIS_065160; AB Ex. 28 at OPTIMIS_0065168; Hr'g Tr. 63–64.

[197]  AB at 31; Hr'g Tr. 63.

[198]  AB at 30–31, 53, 55, 59; AB Ex. 26; Waite Dep. 21; Atkins Dep. 19–21; Smith Dep. 31; AB Ex. 28 at OPTIMIS_0065168; Hr'g Tr. 63.

[199]  *E.g.*, OB at 47 ("[T]here is no record evidence that All-Star outcompeted Rancho in the marketplace or that it did so through improper means."); *id.* at 47–48 (identifying an "absence of any record evidence that All-Star's value increased" or that any alleged value "from any sale of All-Star's assets was attributable to the unquantified advantage that All-Star purportedly gained by taking over Rancho's market-share as a result of Defendants' decision to withhold the Award from Optimis").

[200]  *Id.* at 47 ("First, the gains that Plaintiff alleges were purportedly for All-Star, not Defendants. All-Star is not a party to this action.  Defendants are not All-Star.  Other than stating that Defendants are 'principals of All-Star, the record does not evidence any enrichment Defendants received–through All-Star or otherwise.  Even if it did, an indirect increase in All-Star's value alone, is insufficient to constitute unjust enrichment under Delaware law . . . ."(citations omitted)); *id.* at 48–49.

[201]  *Acadia Brandywine Town Ctr., LLC v. Furniture Brands Int'l, Inc.*, 2010 WL 629840, at \*2 (Del. Super. Feb. 17, 2010) ("[S]ummary judgment is appropriate if the non-moving

to show it could demonstrate Defendants were enriched.  The Motion is **GRANTED** as to Count III.

### III.   CONCLUSION

For the foregoing reasons, summary judgment on Count II is **DENIED** for Defendants and **GRANTED** in Plaintiff's favor as to liability only and Count III is **GRANTED** for Defendants.  **IT IS SO ORDERED.**  The parties are directed to conform their pre-trial stipulation with the rulings in this opinion.

---

party, after an adequate time for discovery has passed, fails to make a sufficient showing on an essential element of the case with respect to which it has the burden of proof." (citing *Burkhart v. Davies*, 602 A.2d 56, 60 (Del. 1991))).